No. 24-1762

IN THE
# United States Court of Appeals for the Federal Circuit

GO1 PTY, LTD.,

*Appellant,*

*v.*

OPENSESAME, INC.,

*Appellee.*

On Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board No. IPR2022-01439

## OPENING BRIEF OF
## APPELLANT GO1 PTY, LTD.

Elizabeth R. Moulton
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA  94105

Robbie Manhas
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037
(202) 339-8400

Bas de Blank
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025

*Counsel for Appellant*

**U.S. PATENT. NO. 8,784,113, CLAIM 1
CLAIM LANGUAGE AT ISSUE ITALICIZED**

**1.** An e-learning delivery system, comprising:

a licensing/reporting server;

a network-side content player operably coupled with each of the licensing/reporting server and a content delivery network comprising stored e-learning content; and

a proxy comprising coded instructions stored on a non-transitionary computing device-readable medium at the network-side, wherein the proxy instructions identify a specific instance of licensed content, and wherein the proxy instructions are configured when executed on a client-side computing device to enable a user to access and interact with the licensed content via a browser of the computing device …

wherein the licensing/reporting server includes coded instructions configured when executed to cause the licensing/reporting server to verify a validity status of the user license to the specific instance of content, and *upon verifying the validity of the license, the instructions are further configured to cause the licensing/reporting server to provide to the proxy a location designator for accessing the content player*;

wherein the proxy instructions are further configured, when executed on the client-side computing device in response to a request for access to the specific instance of content, to: cause the client-side computing device to request verification by the licensing/reporting server of the validity status of a license to the specific instance of content; and cause the client-side computing device to instruct a browser to access the content player via the location designator;  ….

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 24-1762

**Short Case Caption** GO1 Pty, Ltd. v. OpenSesame, Inc.

**Filing Party/Entity** GO1 Pty, Ltd.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/09/2024

Signature: /s/ Robbie Manhas

Name: Robbie Manhas

i

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| GO1 Pty, Ltd. | | Apiom, Inc. |
| | | SEEK Limited |
| | | SoftBank Group Corp. |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

ii

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐  None/Not Applicable          ☐  Additional pages attached

| O'Melveny & Myers LLP | Benjamin Haber | William M. Fink |
|---|---|---|
| Carolyn Wall | Caitlin P. Hogan | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)    ☐  No    ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑  None/Not Applicable          ☐  Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ...................................................i

TABLE OF AUTHORITIES.....................................................vi

STATEMENT OF RELATED CASES ...................................ix

INTRODUCTION.....................................................................1

JURISDICTIONAL STATEMENT ........................................3

STATEMENT OF THE ISSUE................................................3

STATEMENT OF THE CASE ................................................4

    The '113 Patent Claims An E-Learning System That, Per Its "Providing A Location Designator" Limitation, Provides Access To Content After Verifying A User's License. ............4

    E-Learning Systems And Methods—Including Providing Access To Content After Verifying A User's License— Were Well Known....................................................................9

    The Board Upheld The Claims Solely Based Upon The "Providing A Location Designator" Limitation's Verification-Then-Access Dynamic.......................................13

SUMMARY OF ARGUMENT ................................................18

STANDARD OF REVIEW.....................................................21

ARGUMENT ...........................................................................22

I.    The Board Legally Erred By Unduly Constraining The Motivation-To-Combine Analysis To Conclude That Go1 Had Not Shown Claims 1-16 Unpatentable..................22

    A.    Go1 showed motivation to combine Sperle and Madison to practice the "providing a location designator" limitation's sequencing of steps. ..............23

    B.    The Board legally erred by rigidly focusing on Sperle's and Madison's express disclosures, impermissibly bypassing a skilled artisan's creativity and common sense.......................................32

iv

CONCLUSION .......................................................................................... 40

ADDENDUM

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACCO Brands Corp. v. Fellowes, Inc.*,
    813 F.3d 1361 (Fed. Cir. 2016) .......................................................... 25

*Belden Inc. v. Berk-Tek LLC*,
    805 F.3d 1064 (Fed. Cir. 2015) ................................................... 21, 32

*C.R. Bard, Inc. v. Medline Indus., Inc.*,
    No. 2020-1900, 2021 WL 3574043 (Fed. Cir. Aug. 13,
    2021) ........................................................................ 25, 28, 32, 33, 34

*Canfield Sci., Inc. v. Melanoscan, LLC*,
    987 F.3d 1375 (Fed. Cir. 2021) .......................................................... 22

*Chiron Corp. v. Genentech, Inc.*,
    363 F.3d 1247 (Fed. Cir. 2004) .......................................................... 34

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938) ............................................................................ 21

*CRFD Rsch., Inc. v. Matal*,
    876 F.3d 1330 (Fed. Cir. 2017) ................................................... 26, 33

*DyStar Textilfarben GmbH & Co. v. C.H. Patrick Co.*,
    464 F.3d 1356 (Fed. Cir. 2006) .......................................................... 24

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
    955 F.3d 1317 (Fed. Cir. 2020) ................................................... 27, 38

*Gen. Elec. Co. v. Raytheon Techs. Corp.*,
    983 F.3d 1334 (Fed. Cir. 2020) .......................................................... 21

*Henkel Corp. v. Procter & Gamble Co.*,
    485 F.3d 1370 (Fed. Cir. 2007) .......................................................... 32

*Hensley v. West*,
    212 F.3d 1255 (Fed. Cir. 2000) .......................................................... 32

*I/P Engine, Inc. v. AOL Inc.*,
    576 F. App'x 982 (Fed. Cir. 2014) ....................................................... 24

*Intel Corp. v. PACT XPP Schweiz AG*,
    61 F.4th 1373 (Fed. Cir. 2023) .................................... 20, 23, 24, 25, 36

*Intel Corp. v. Qualcomm Inc.*,
    No. 2020-2092, 2022 WL 880681 (Fed. Cir. Mar. 24, 2022)... 23, 26, 32

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) ..................................1, 3, 16, 23, 24, 25, 31, 32, 34

*Merck & Co. v. Biocraft Labs., Inc.*,
    874 F.2d 804 (Fed. Cir. 1989) ............................................................. 33

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
    584 U.S. 325 (2018) ............................................................................. 21

*Perfect Web Techs., Inc. v. InfoUSA, Inc.*,
    587 F.3d 1324 (Fed. Cir. 2009) ............................ 20, 24, 25, 29, 30, 32,
                                                                                33, 35, 36, 37, 38, 39

*PersonalWeb Techs. v. Google LLC*,
    8 F.4th 1310 (Fed. Cir. 2021)....................................................... 27, 38

*Philips Lighting N. Am. Corp. v. Wangs All. Corp.*,
    727 F. App'x 676 (Fed. Cir. 2018).......................................... 20, 25, 36

*PlaSmart, Inc. v. Kappos*,
    482 F. App'x 568 (Fed. Cir. 2012) ...................................................... 25

*Tokai Corp. v. Easton Enters., Inc.*,
    632 F.3d 1358 (Fed. Cir. 2011) ........................................ 30, 33, 35, 36

*Uber Techs., Inc. v. X One, Inc.*,
    957 F.3d 1334 (Fed. Cir. 2020) ........................21, 24, 25, 29, 30, 32, 36

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951)............................................................................. 22

*W. Union Co. v. MoneyGram Payment Sys., Inc.*,
    626 F.3d 1361 (Fed. Cir. 2010) ..................................................... 30, 33

*Wyers v. Master Lock Co.*,
  616 F.3d 1231 (Fed. Cir. 2010) ................................................ 24, 36, 38

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ................................................................ 3

35 U.S.C. § 6(b)(4) ......................................................................... 3

35 U.S.C. § 103 ............................................................................ 24

35 U.S.C. § 141(c) .......................................................................... 3

35 U.S.C. § 142 .............................................................................. 3

35 U.S.C. § 311(a) .......................................................................... 3

35 U.S.C. § 316(c) .......................................................................... 3

35 U.S.C. § 318(a) .......................................................................... 3

35 U.S.C. § 319 .............................................................................. 3

**Rules and Regulations**

37 C.F.R. § 90.3(a)(1) ..................................................................... 3

## STATEMENT OF RELATED CASES

No appeal in or from the same proceeding has previously been before this or any other appellate court.

This Court's decision may directly affect or be directly affected by the following case that involves the same patent that is at issue in this appeal: *OpenSesame, Inc. v. GO1 Pty, Ltd.*, No. 3:21-cv-1258 (D. Or.).

# INTRODUCTION

This IPR appeal calls upon this Court to uphold motivation-to-combine law's fundamental prohibition against "[r]igid preventative rules that deny factfinders recourse to common sense." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

The claim limitation at issue recites two steps that must be performed in order. The Board did not dispute that the prior art taught both steps; however, it assumed that the prior art taught the steps in the opposite order. The question, then, is whether combining the prior art to reverse their sequencing would have been obvious to a skilled artisan. There were only two possible ways to sequence the steps, and there was no argument—let alone evidence—that switching the prior art's sequencing would have been any less effective, involved any technical challenge, or produced any unexpected result. On the contrary, the sole expert testimony addressing the obviousness of flipping the order explained that doing so would have been an inconsequential design choice. Nevertheless, the Board determined that the claims were not unpatentable for obviousness because the prior art did not disclose the precise sequencing claimed.

This misguided outcome is even less defensible in context.  The
challenged claims are generic, functionally recited software claims
relating to online education.  And the two-step sequence upon which the
Board rested its decision reflects a familiar and long-established
practice: confirming credentials before providing access to restricted
material.  The first step is verifying a user's license to requested
teaching content.  The second step is providing a "proxy" a "location
designator"—that is, providing software a URL to the requested content
so that the user may access it.  The Board did not dispute that two
prior-art references—Sperle and Madison—taught these steps (albeit,
as mentioned, in reverse order).  Despite that teaching—and despite the
fact that confirming credentials before providing access to restricted
material is a commonplace order of operations practiced across various
contexts, from when a librarian loans out a book to when a cellphone
unlocks—the Board concluded that a skilled artisan would not have
been motivated to combine the references to verify a user's license
*before* providing the URL.

The Board reached this untenable nonobviousness conclusion
based on legal error: inflexible focus on the express disclosures of Sperle

and Madison, without consideration of a skilled artisan's creativity and common sense. Because "a person of ordinary skill in the art is also a person of ordinary creativity, not an automaton," *KSR*, 550 U.S. at 421, this Court should reverse or at least vacate and remand on the question of motivation to combine.

## JURISDICTIONAL STATEMENT

The Board had jurisdiction in the IPR below under 35 U.S.C. §§ 6(b)(4), 311(a), 316(c), and 318(a). The Board issued its final written decision on February 26, 2024. Go1 timely filed a notice of appeal on April 29, 2024. *See* 35 U.S.C. § 142; 37 C.F.R. § 90.3(a)(1). This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c) and 319.

## STATEMENT OF THE ISSUE

Whether the Board committed an error of law in finding a lack of motivation to practice the "providing a location designator" limitation's order of steps—namely, by rigidly focusing on the express disclosures of Sperle and Madison, contrary to the flexible legal framework governing motivation to combine and its emphasis on ordinary creativity.

## STATEMENT OF THE CASE

***The '113 Patent Claims An E-Learning System That, Per Its "Providing A Location Designator" Limitation, Provides Access To Content After Verifying A User's License.***

This appeal concerns U.S. Patent No. 8,784,113, which claims an "e-learning delivery system."  Appx39-59 ('113 patent); Appx55-56 (16:48-17:19) (claim 1).  E-learning is education delivered online.  *See* Appx48 (1:15-19).  The patent acknowledges that, as of its claimed 2010 priority date, e-learning was an established industry.  *See, e.g.*, Appx48 (1:59-65) (discussing industry standards); Appx49 (4:5-13) (discussing exemplary commercial systems and devices).

As the patent characterizes the art, "conventional[]" "[l]earning management systems (LMSs)" allowed a "corporation [to] make[] teaching content available on-line to employees," including by conditioning access to course content on verification of "authoriz[ation] … under management mandate or permission." Appx48 (1:23-27); *see* Appx49 (4:5-8) (listing exemplary LMSs). "[T]eaching content" was "[t]ypically" stored on "central servers" and could be delivered by "[c]ontent delivery networks (CDNs)"—which "conventionally provide[d] application-specific on-line content, e.g.

4

music via ITUNES™." Appx48 (1:27-28, 1:45-47); *see* Appx50 (5:5-14) (listing exemplary content delivery networks). Users accessed the content via content players "resident in the user's browser." Appx52 (10:19-20); *see* Appx49 (4:8-14) (listing exemplary players). And "licensing/reporting server[s]"—that is, "digital rights management (DRM) server[s]"—ensured that access was only provided to authorized users. Appx49 (3:19-21); *see* Appx48 (1:23-27) (recognizing that access control was known); Appx55 (15:54-16:40) (recognizing that "most of the machinery of the present invention" is generic).

The patent describes its contribution to e-learning as the addition of a "proxy" (also called a "SCORM package" and "SESAMESEED"). Appx48 (2:49-62). This proxy is a "set of coded instructions" that "links" the well-known components of an e-learning system, facilitating communications between them. Appx48 (2:49-66) (stating that the proxy "communicates with the system" to "perform a designated task or set of tasks"); *accord* Appx51-52 (7:8-11, 8:57-9:30) (stating that the proxy "bridges" different sides of the system and describing how the proxy "act[s] as the link between" system parts).

5

Figure 3 of the patent depicts the claimed system, including an exemplary "SESAMESEED" proxy. *See* Appx42. In the color-coded version of the figure below, the proxy is demarcated in blue. The arrows "indicate conveyance of a request, a response, instructions, content, or another type of information, for example, from one block or user to another." Appx51 (7:34-37).



**Figure 3**

Learner launches course from his/her LMS

Appx42 (coloring added).

Relevant here, the proxy communicates with the system's licensing/reporting server to "enforce access control" and "provide [users] access" to teaching content. Appx48 (2:55-57). As illustrated in the red line above (3c), the proxy "makes a licensing request to the licensing/reporting server." Appx52 (9:5-6). The server then compares the user's license information to its internal records and returns to the proxy either "a script containing a player URL" directing a browser (or other content player) to the location of the requested content or "a signal indicating that access is denied." Appx52 (9:6-11); *see* Appx49 (4:37-57). Per the green line above (3d), "if authorization succeeds," the proxy "instructs the learner's web browser to load the player URL," allowing the user to access the corresponding content. Appx52 (9:18-27).

In short, the proxy operates much like a librarian in verifying access to requested materials. Just as a librarian verifies that visitors are authorized to borrow books that they have requested, then provides the books, the proxy works in tandem with the licensing/reporting server to verify that users are authorized to access the teaching content that they have requested, then provides that content.

This appeal centers on the patent's verification-then-access dynamic, which is claimed by the patent's "providing a location designator" limitation. This limitation is present in each independent claim. Claim 1's limitation, italicized below, is representative:

> the licensing/reporting server includes coded instructions configured when executed to cause the licensing/reporting server to verify a validity status of the user license to the specific instance of content, and *upon verifying the validity of the license, the instructions are further configured to cause the licensing/reporting server to provide to the proxy a location designator for accessing the content player.*

Appx55-56 (16:64-17:4) (emphasis added).[1]

The "providing a location designator" limitation thus requires the licensing/reporting server to allow access to teaching content by taking two actions in sequence: (1) verifying a user's license, then (2) providing a proxy with a location designator. An exemplary location designator is a URL targeting a specific instance of content, which the proxy uses to

---

[1] *Cf.* Appx56 (17:50-53) (claim 5's version: "providing, from the licensing/reporting server to the proxy in response to a successful license verification … , the content player location designator"); Appx56 (18:36-38) (claim 11's version: the proxy "receiv[ing] from the licensing/reporting server, in response to a successful verification of the license, a location designator for a content player").

load the content onto a content player.  Appx49 (4:49-57); *see* Appx56 (17:5-8, 13-15) (claim 1 reflecting this feature).

### E-Learning Systems And Methods—Including Providing Access To Content After Verifying A User's License—Were Well Known.

The '113 patent occupies a crowded field of e-learning prior art. *See* Appx656-663 ¶¶ 44-52, Appx667-674 ¶¶ 62-73 (Go1's expert on the prior art); Appx1132-1195 (Go1's asserted prior-art references).  And as to the sole issue on appeal, the specific dynamic of providing access to e-learning content after verifying a license was well-known before the patent's clamed priority date.  Two prior-art references—Sperle and Madison—exemplify that knowledge.

**Sperle (Appx1132-1149).**  Sperle is a published U.S. patent application titled "Delivery Methods for Remote Learning System Courses."  Appx1132, code (54).  Sperle discloses an e-learning system that provides a personalized learning experience by proposing courses based on a learner's personal data and tracking the learner's progress through the material.  Appx1138 ¶ 11.

To provide access to a course, Sperle's system may verify a learner's license.  Sperle discloses that its course catalog "includes information indicating specific checks that may be performed for a

course," such as whether the student "has a valid license."  Appx1139 ¶ 16.  In accord, Sperle's claims recite a "license check."  Appx1148-1149 (claims 6, 15, and 24); *cf.* Appx1135-1137 (figures 5A and 5B depicting consideration of licenses for course delivery at 506 and 514; figures 5C and 6 depicting checks for course delivery at 520, 608, and 612).

Sperle's license verification may be implemented by its enterprise resource planning solution 135 (demarcated in orange below), which contains learning management system 140 (demarcated in blue below), which in turn contains reporting module 214 (demarcated in red below). The solution is "a composite application that includes, execute[s], or otherwise implement[s]" Sperle's functionalities, including those of the learning management system.  Appx1140 ¶ 18; *see* Appx1141 ¶ 21.  One such functionality is the learning management system's "determin[ing]" of "specific check[s]," such as license checks.  Appx1141 ¶ 20; Appx1143 ¶ 27; Appx1147-1148 ¶¶ 59-60.  Another is the reporting module's "notifi[cation]" of requests to participate in courses so that the requests can be "approve[d] or reject[ed]."  Appx1144 ¶ 34.



Appx1133 (coloring added and figures combined).

**Madison (Appx1150-1169).** Madison is a published U.S. patent application titled "System and Method for Controlling Access to Digital Content, Including Streaming Media." Appx1150, code (54). Madison discloses that "streaming media may be used for any of a number of purposes, including … distance learning," Appx1159 ¶ 4, and emphasizes that "controlling access to" streaming media, such as "on-line educational courses," is "imperative," Appx1159 ¶ 5.

To that end, Madison discloses an exemplary access-control system that compares two tickets to verify whether a user should be granted access to a media file.  Appx1150, Abstract; Appx1159 ¶ 2.  "[I]n response to an end user's request for access," a web server "cryptographically generates a ticket."  Appx1159 ¶ 8; Appx1164-1165 ¶¶ 72-76.  Next, a playlist server generates a redirector file that includes a URL targeting the requested file.  Appx1165 ¶¶ 79-81.  The redirector file is sent to the end user's device, which then makes a call to the streaming media server hosting the file.  Appx1165 ¶¶ 81, 83.  The media server in turn "generates an authorization ticket, preferably using the same cryptographic algorithm as the web server."  Appx1159 ¶ 9; Appx1165 ¶ 84.  The media server then "determines whether to grant access to the file by comparing" its ticket to the one generated by the web server.  Appx1159 ¶ 9; Appx1165 ¶ 84.  If the tickets match, the media server grants access.  Appx1159 ¶ 10; Appx1165 ¶ 84.

Madison discloses that its system "has many applications, may be implemented in many manners, and as such, is not to be limited" by its described "exemplary embodiments and examples."  Appx1167 ¶ 98.  For example, Madison specifies that its "scope … covers conventionally

known … variations and modifications," Appx1167 ¶ 98, and that its

"tickets need not be generated at precise times," Appx1166 ¶ 87.

Madison's claims likewise do not require verification to occur after the

creation of a redirector file or its receipt of a URL. Appx1167-1169.

### The Board Upheld The Claims Solely Based Upon The "Providing A Location Designator" Limitation's Verification-Then-Access Dynamic.

Go1 filed an IPR petition challenging all claims for obviousness.

Appx63-148 (petition). After institution and full briefing, the Board

determined that Go1 had not shown the claims to be unpatentable.

Appx1-38 (final written decision); *see* Appx212-268 (institution

decision); Appx154-211 (OpenSesame's preliminary patent owner

response); Appx347-414 (OpenSesame's patent owner response);

Appx415-446 (Go1's reply); Appx489-519 (OpenSesame's sur-reply).

The Board ruled on only one basis: that Go1 had ostensibly failed to

show the obviousness of the "providing a location designator"

limitation's claimed sequencing. Appx17; Appx26-30; Appx33-35. As

discussed above (at 8), this sequencing requires the licensing/reporting

server to be configured to allow access to teaching content by taking two

steps in order: (1) verifying the user's license, then (2) providing the proxy with the location designator. *E.g.*, Appx55-56 (16:64-17:4).

The Board "first describe[d]" Go1's positions on how the prior art taught constituent limitations. Appx17-26. Stripped to the essentials:

- **Licensing/reporting server.** Go1 mapped the claimed licensing/reporting server to the combination of Madison's web server with authorization software and Sperle's reporting module, as demarcated in red below. Appx18-19 (final written decision); Appx89-95 (petition); Appx681-689 ¶¶ 90-101 (Go1's expert) *cf.* Appx55 (16:49) (claim 1's recitation of a licensing/reporter server).



Appx19 (annotated version); Appx1133 (original).

- **License verification.** Go1 mapped verification of a user's license to the combination of Sperle's and Madison's license-verification teachings. Appx22-24 (final written decision); Appx108-110 (petition); Appx706-709 ¶¶ 129-33 (Go1's expert); *cf.* Appx55 (16:64-68) (claim 1's recitation of verifying the validity of a license). For example, Go1 invoked Sperle's check as to whether the user has a valid license, Appx108; Appx707 ¶ 131, and Madison's ticket matching, Appx108-110; Appx707-709 ¶¶ 132-33.

- **Proxy.** Go1 mapped the claimed proxy to two alternative teachings: (1) Sperle's solution or (2) Madison's access-control software, including Madison's redirector file and the network-side software that creates it (integrated within Sperle's system). Appx99-105 (petition); Appx694-703 ¶¶109-22 (Go1's expert); *see* Appx20-22 (final written decision); *cf.* Appx55 (16:53-63) (claim 1's recitation of a proxy).

- **Location designator.** Go1 mapped the claimed location designator to the URL included in Madison's redirector file that targets the requested content. Appx24-25 (final written decision); Appx111-112 (petition); Appx709-710 ¶ 136 (Go1's expert); *cf.* Appx56 (17:3-4) (claim 1's recitation of a location designator).

Without disputing that any of these individual claim requirements were satisfied, the Board nevertheless determined that Go1 had not demonstrated the obviousness of the "providing a location designator" limitation's specific sequence of steps—namely, that the licensing/reporting server provides the location designator to the proxy *after* verifying the user's license. Appx26-30.

The Board began by faulting Go1 for not "rely[ing] on any express disclosure in Sperle or Madison" for the claimed sequencing. Appx26. The Board noted that "Sperle discloses performing a 'check' to determine whether a course 'has a valid license,' but does not provide any details for that license check." Appx26 (quoting Appx1139 ¶ 16). As for Madison, the Board found that license verification there came too

15

late.  Appx26-27.  The Board observed that Madison discloses
"generating a redirector file with [a] URL *before* [Madison's]
authorization check"—that is, providing a proxy with a location
designator before license verification, rather than after license
verification as claimed.  Appx27.

The Board then rejected Go1's argument that the lack of express
disclosure of the claimed sequencing was immaterial.  Appx27-30.  Go1
contended that express disclosure was unnecessary under *KSR*, which
recognizes that a person ordinarily skilled in the art is "a person of
ordinary creativity, not an automaton."  Appx431 (citing *KSR*, 550 U.S.
at 421).  Under that legal standard, Go1 argued that any sequencing
difference between Madison and the claimed invention was an
"inconsequential" design choice that would not defeat obviousness, as
Go1's expert testified.  Appx431-432 (citing Appx1491-1492 ¶¶ 90-91).

Meanwhile, as Go1 pointed out, OpenSesame "d[id] not identify"
any "material difference" between the claims and the prior art,
including "what consequences exist, if any," for reversing Madison's
sequence of steps.  Appx431-432.  For instance, OpenSesame never
contended that implementing the claimed sequencing would have been

technically difficult for a skilled artisan given that Sperle and Madison otherwise taught the "providing a location designator" limitation. Nor did OpenSesame argue that the claimed sequencing would have had unexpected results. Instead, OpenSesame argued only that neither Sperle nor Madison themselves discloses the claimed sequencing. Appx385-390 (relevant portion of OpenSesame's patent owner response); Appx506-507 (relevant portion of OpenSesame's sur-reply); Appx2934, Appx2936-2938 ¶¶ 113, 118, 123-24 (relevant portion of OpenSesame's expert's supplemental declaration); Appx2576-2577 (relevant portion of Open Sesame's expert's deposition) *cf.* Appx188, Appx2855-2856 ¶¶ 104-06 (OpenSesame's preliminary patent owner response and expert's original declaration not addressing the sequencing issue).

The Board likewise did not find that a skilled artisan would have faced any difficulty implementing the claimed sequencing or that implementing the sequencing would have produced any unexpected result. Rather, the Board dismissed Go1's design-choice argument based on a single finding: that Go1's expert testimony was "conclusory." Appx29. In the Board's view, Go1's expert testimony that the claimed

sequencing was "'insubstantially different'" and reflected mere "'design choice'" was "simply insufficient" because the testimony was "not supported by any evidence contemporaneous with the claimed invention" and did "not provide any technical explanation." Appx29 (quoting Appx1491-1492 ¶¶ 90-91). At bottom, the Board demanded an affirmative, technical analysis of "why a skilled artisan would [have] go[ne] beyond what is taught in Madison and provide the URL to the proxy 'upon verifying the validity of the license' rather than prior to that verification." Appx29. The Board upheld every claim on this reasoning alone. Appx30; Appx33-35.

## SUMMARY OF ARGUMENT

Go1 showed motivation to combine Sperle and Madison to practice the sequencing claimed, and the Board legally erred in finding otherwise. The Board assumed that the references taught all limitations except the precise two-step sequencing of the "providing a location designator" limitation: (1) verifying a user's license *then* (2) providing a proxy with a location designator. Under a properly flexible analysis for motivation to combine—which considers logic, judgment, common knowledge, and common sense—that sequencing

was a trivial detail that would have been obvious to a skilled artisan who already knew how to practice both steps.

A skilled artisan would have faced nothing more than a design choice between two sequencing options: verifying a user's license first or second.  And the claimed option—verifying first—would have been particularly obvious because verifying credentials before providing access to restricted material is ubiquitous in everyday life.  Librarians do it, ATMs do it, and phones do it.  Implementing it here would serve the same purpose of limiting access to authorized users, too.  That suffices to establish motivation.

Confirming that claimed sequencing would have been obvious as a matter of commonsense design choice, OpenSesame did not argue, and the Board did not find, any technical difficulty or unexpected result associated with verifying first.  Nor does the patent's alleged novelty concern license verification's timing.  The patent holds out only the proxy as novel—and the Board assumed that the references taught it.

The Board failed to appreciate the obviousness of verifying first because, contrary to the governing legal standard, the Board rigidly focused on Sperle's and Madison's express disclosures without

considering a skilled artisan's creativity. Although neither reference expressly discloses the claimed sequencing, obviousness does not require express disclosure. And because the claimed sequencing merely reflects a predictable variation of the prior art, this case mirrors those in which this Court has held claims invalid for obviousness as matter of law despite the prior art's lack of express disclosure.

The Board's treatment of Go1's expert testimony is legally flawed for similar reasons. To start, by demanding that Go1's expert provide a specific affirmative reason why a skilled artisan would have reversed Madison's order of operations, the Board contravened the caselaw, which does not require a specific affirmative reason. It was sufficient for Go1 to show that reversing Madison's sequencing would have been a "suitable option" for limiting access to authorized users, which it undisputedly would have been. *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380 (Fed. Cir. 2023); *see Philips Lighting N. Am. Corp. v. Wangs All. Corp.*, 727 F. App'x 676, 682 (Fed. Cir. 2018). Moreover, expert testimony was "not necessary" given the undisputedly predictable nature of reversing Madison's sequencing. *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587 F.3d 1324, 1330 (Fed. Cir. 2009). At

the very least, the Board parsed Go1's expert's testimony with too fine a filter given the undisputed predictability. In all events, the Board's determination that Go1 did not show the claims unpatentable for obviousness cannot be sustained.

## STANDARD OF REVIEW

This Court "review[s] the Board's factual findings for substantial evidence" and "its legal conclusions de novo." *Uber Techs., Inc. v. X One, Inc.*, 957 F.3d 1334, 1337 (Fed. Cir. 2020). "The Board's ultimate determination on obviousness" is reviewed de novo. *Id.* Whether the Board complied with "'governing legal standards'" is likewise reviewed de novo. *Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1344 (Fed. Cir. 2020) (quoting *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015)); *see Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 332 (2018). Motivation to combine is reviewed for substantial evidence. *Gen. Elec.*, 983 F.3d at 1345-455.

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). "The substantial evidence inquiry requires examination of

21

the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *Canfield Sci., Inc. v. Melanoscan, LLC*, 987 F.3d 1375, 1378 (Fed. Cir. 2021) (internal quotation marks omitted); *accord Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487-88 (1951).

## ARGUMENT

### I.    The Board Legally Erred By Unduly Constraining The Motivation-To-Combine Analysis To Conclude That Go1 Had Not Shown Claims 1-16 Unpatentable.

The Board's rejection of Go1's obviousness challenge cannot be squared with motivation-to-combine precedent.  The Board did not disagree that the asserted references disclose the "providing a location designator" limitation's two steps: (1) verifying a user's license and (2) providing a proxy with a location designator.  Appx17-26.  All that remained for obviousness was motivation to combine the references to practice the limitation's sequencing of those steps: verifying a user's license *then* providing a proxy with a location designator.  Under motivation to combine's flexible legal framework, Go1 showed that motivation.  § I.A.  The Board concluded otherwise only by replacing the governing framework's flexibility with rigidity.  Specifically, the Board

demanded that the references either expressly disclose the sequencing claimed or that expert testimony provide an affirmative, technical explanation of why a skilled artisan would have modified them to practice it.  Appx26-29.  The Board demanded too much, § I.B, and its determination should be reversed or at least vacated.

### A.  Go1 showed motivation to combine Sperle and Madison to practice the "providing a location designator" limitation's sequencing of steps.

Under the flexible legal framework governing motivation to combine, Go1 showed motivation to reach the sequencing claimed.

**1.**  "The motivation-to-combine analysis is a flexible one."  *PACT*, 61 F.4th at 1379.  Two interrelated principles reflecting this flexibility are important here.

First, the analysis "assumes" that a skilled artisan is "a person of ordinary creativity with common sense, common wisdom, and common knowledge," *Intel Corp. v. Qualcomm Inc.*, No. 2020-2092, 2022 WL 880681, at *3 (Fed. Cir. Mar. 24, 2022), "not an automaton," *KSR*, 550 U.S. at 421.  Thus, the "analysis 'need not seek out precise teachings directed to the specific subject matter of the challenged claim.'"  *PACT*, 61 F.4th at 1380 (quoting *KSR*, 550 U.S. at 418).  Rather, "court[s] can

take account of the inferences and creative steps that a person of ordinary skill in the art would employ.'" *Id.* (quoting *KSR*, 550 U.S. at 418). Indeed, they must. *I/P Engine, Inc. v. AOL Inc.*, 576 F. App'x 982, 989 (Fed. Cir. 2014); *DyStar Textilfarben GmbH & Co. v. C.H. Patrick Co.*, 464 F.3d 1356, 1367 (Fed. Cir. 2006). And such "recourse to logic, judgment, and common sense … do[es] not necessarily require explication in any reference or expert opinion." *Perfect Web*, 587 F.3d at 1329-32 (in affirming summary judgment of obviousness of repeating software method steps, holding that "[n]o expert opinion [was] required" to show motivation); *accord Wyers v. Master Lock Co.*, 616 F.3d 1231, 1239-45 (Fed. Cir. 2010) (in likewise finding motivation to combine as a matter of law, holding that "the legal determination of obviousness may include recourse to logic, judgment, and common sense, in lieu of expert testimony").

Second, the analysis recognizes that "a person of ordinary skill 'has good reasons to pursue … known options within his or her technical grasp.'" *Uber*, 957 F.3d at 1340 (quoting *KSR*, 550 U.S. at 421); *see KSR*, 550 U.S. at 417 ("If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability.").

Thus, when a skilled artisan could have chosen from a limited set of predictable options, the analysis need "not identify [a] specific 'affirmative reason'" to select any such option over another, *Philips Lighting*, 727 F. App'x at 682, as motivation requires showing merely that an option would have been "suitable," *PACT*, 61 F.4th at 1381. Put otherwise, a "'finite number of identified, predictable solutions'" suggests that all such solutions "would have been obvious to try." *Perfect Web*, 587 F.3d at 1331 (quoting *KSR*, 550 U.S. at 421).

Applying these principles, this Court has repeatedly reversed the Board to find as a matter of law that a skilled artisan would have been motivated to make a "simple design choice" between "two" "predictable" variations. *Uber*, 957 F.3d at 1340 (choice between server-side plotting and terminal-side plotting); *see, e.g.*, *C.R. Bard, Inc. v. Medline Indus., Inc.*, No. 2020-1900, 2021 WL 3574043, at *4-5 (Fed. Cir. Aug. 13, 2021) (choice between storing syringes "either together … or apart"); *ACCO Brands Corp. v. Fellowes, Inc.*, 813 F.3d 1361, 1367 (Fed. Cir. 2016) (choice between locating a sensor above or below another); *PlaSmart, Inc. v. Kappos*, 482 F. App'x 568, 574 (Fed. Cir. 2012) (choice between attaching a wheel to one structure or another). In fact, this Court has

done so in the precise context of sequencing software steps "before or after" one another. *CRFD Rsch., Inc. v. Matal*, 876 F.3d 1330, 1346-49 (Fed. Cir. 2017) (choice between transmitting software session history "before or after" discontinuing a session).

**2.**   Under a properly flexible analysis, Go1 showed the requisite motivation.  The question is whether a skilled artisan—armed with a technical degree and "at least two years of experience in the research, design, development, and/or testing of systems for delivering educational content over networks such as the Internet," Appx9-10—would have been motivated to pursue the claimed sequencing as a matter of "common sense, common wisdom, [or] common knowledge." *Qualcomm*, 2022 WL 880681, at *3.  The answer is yes.

At issue is the sequencing of only two events: providing a location designator to a proxy and verifying a user's license.  And there are only two sequencing options: providing the location designator before or after license verification.  In claiming the latter, the "providing a location designator" limitation covers a commonsense and commonplace order of operations.  Routine, everyday experience aligns with the claimed sequencing of providing access to restricted materials after verifying

credentials.  Consider, for example, a librarian requiring a library card before loaning books, a doctor requiring a consent form before providing access to a patient's medical history, an ATM requiring a card and a PIN before allowing access to a bank account, and a phone requiring a password to unlock.  *See* Appx1159 ¶ 6 (Madison disclosing that "[t]he current industry standard for limiting access to streaming content involves the streaming media server authenticating end-users *before* providing the streaming media content" (emphasis added)); Appx1164-1165 ¶ 72 (Madison disclosing "the end user … log[ging] in to an authorization application" to request access to a file); *cf. PersonalWeb Techs. v. Google LLC*, 8 F.4th 1310, 1317-18 (Fed. Cir. 2021) (in the abstract-idea context, holding that "[c]ontrolling access to data items" reflects fundamental human activity "long predat[ing] computers"); *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1327 (Fed. Cir. 2020) (similarly holding that "[c]ontrolling access to resources is … pervasive in human activity, whether in libraries (loaning materials only to card-holding members), office buildings (allowing certain employees entrance to only certain floors), or banks (offering or denying loans to applicants based on suitability and intended use)").

The ubiquity of verifying first means that a skilled artisan would have found that sequencing vis-à-vis providing a location designator obvious at least to try, particularly given that an artisan combining Sperle and Madison would have faced only one other choice. "Although the prior art does not expressly direct a skilled artisan" to the claimed sequencing, "it certainly was well within the possibilities available," and "a skilled artisan had ample reason to avail himself of [this] obvious option" to achieve license verification's undisputedly known purpose of restricting access to authorized users. *C.R. Bard*, 2021 WL 3574043, at *4 (internal quotation marks omitted). As Go1 put it below, the difference in sequencing was "inconsequential" and would not have "prevent[ed]" motivation to combine to control access to teaching content. Appx432; *see* Appx85-88 (Go1 explaining that a skilled artisan would have been motivated to combine Sperle and Madison with a reasonable expectation of success to "implement solutions to the well-known problem of controlled delivery of remote learning content" (citing Appx676-681 ¶¶ 79, 82-83, 85-86; Appx1159 ¶ 6)).

Indeed, Madison itself states that its system "may be implemented in many manners," including to "cover[] conventionally known"

techniques.  Appx1167 ¶ 98; *cf.* Appx1148 ¶ 61 (similar in Sperle).

Madison also explains that its "tickets need not be generated at precise

times."  Appx1166 ¶ 87.  These disclosures confirm that tweaking

Madison to practice the familiar sequence of verifying first would be

well within a skilled artisan's reach and an entirely predictable way to

restrict access to course content.

Cementing that conclusion, OpenSesame "d[id] not identify" any

"material difference" between the claims and the prior art, such as

"what consequences exist, if any," for reversing Madison's sequence of

steps—a point that Go1 stressed to the Board.  Appx431-432.  For

example, OpenSesame never contended—and the Board never found—

that verifying first would have exceeded a skilled artisan's "technical

grasp," *Uber*, 957 F.3d at 1340, or had "any unexpected results," *Perfect*

*Web*, 587 F.3d at 1331.  OpenSesame argued merely that neither Sperle

nor Madison disclosed that sequencing.  Appx385-390 (OpenSesame's

patent owner response); Appx506-507 (OpenSesame's sur-reply);

Appx2934, Appx2936-2938 ¶¶ 113, 118, 123-24 (OpenSesame's expert's

supplemental declaration); Appx2576-2577 (Open Sesame's expert's

deposition); *cf.* Appx188, Appx2855-2856 ¶¶ 104-06 (OpenSesame's

29

preliminary patent owner response and expert's original declaration silent on sequencing).  The Board grounded its analysis in that bare distinction, too.  *See* Appx26-29.  Given the absence of any technical hurdle or surprising outcome, the sequencing claimed was "an insignificant detail" that would have been "a matter of common sense." *W. Union Co. v. MoneyGram Payment Sys., Inc.*, 626 F.3d 1361, 1371-72 (Fed. Cir. 2010) (reversing judgment of nonobviousness as to "trivial" limitations not in the prior art); *see, e.g.*, *Tokai Corp. v. Easton Enters., Inc.*, 632 F.3d 1358, 1372 (Fed. Cir. 2011) (obviousness as a matter of law where a "missing claim limitation" was "nothing more than a predictable variation of the prior art"); *Perfect Web*, 587 F.3d at 1330-32 (same).

If anything, obviousness is especially apparent because "the alleged novelty of the ['113] patent is not related to the differences between" whether license verification occurs first or second.  *Uber*, 957 F.3d at 1339.  The patent characterizes its novelty not as license verification's timing, but rather as the addition of a proxy to an e-learning system—which the Board assumed that the prior art taught. Appx48 (2:49-66); *accord* Appx356 (OpenSesame's patent owner

response); *cf.* Appx1053-1054 (examiner recognizing that prior art taught e-learning systems with license validation; distinguishing the claims based on "the 'proxy' as claimed").  Punctuating the point, license verification's timing is immaterial to the two ostensible problems that the patent contends the proxy helps solve: (1) that existing e-learning systems have "canned" content, Appx48 (1:32-44); and (2) that existing e-learning systems lack interoperability with certain content, Appx48 (1:59-2:15).  *Accord* Appx355-356 (OpenSesame's patent owner response).  The patent identifies no benefit to the claimed timing of license verification.  On the contrary, the patent's description of license verification simply reflects "the purpose of restricting access to authorized users," Appx49 (4:37-57), a functionality that the patent recognizes already existed, Appx48 (1:23-27); Appx49 (3:19-21), and that is equally accomplished by verifying first or second.

In sum, this case presents the classic situation where "a person of ordinary skill can implement a predictable variation" and thus obviousness bars "its patentability."  *KSR*, 550 U.S. at 417.

**B.    The Board legally erred by rigidly focusing on Sperle's and Madison's express disclosures, impermissibly bypassing a skilled artisan's creativity and common sense.**

The Board failed to appreciate the obviousness of the claimed sequencing because the Board applied an incorrect legal standard, "rigidly focus[ing] on the disclosures of individual prior-art references without considering a skilled artisan's creativity and common sense." *C.R. Bard*, 2021 WL 3574043, at *5 (internal quotation marks and brackets omitted).  The Board's cramped analysis contravened *KSR*'s admonition that "'[r]igid preventative rules that deny factfinders recourse to common sense … are neither necessary … nor consistent with'" controlling caselaw.  *Perfect Web*, 587 F.3d at 1329 (quoting *KSR*, 550 U.S. at 421).  The Board's imposition of "a more stringent standard than warranted" was "legal error."  *Henkel Corp. v. Procter & Gamble Co.*, 485 F.3d 1370, 1375 (Fed. Cir. 2007); *accord Uber*, 957 F.3d at 1341; *Qualcomm*, 2022 WL 880681, at *3-4; *Belden*, 805 F.3d at 1075-76; *Hensley v. West*, 212 F.3d 1255, 1264 (Fed. Cir. 2000).

**1.**  The Board started off on the wrong foot by drawing a legally incorrect inference from the lack of "any express disclosure" of the claimed sequencing in Sperle or Madison.  Appx26-27.  "The mere

32

absence from the prior art of … a limitation … is insufficient for a conclusion of nonobviousness," *Merck & Co. v. Biocraft Labs., Inc.*, 874 F.2d 804, 807 (Fed. Cir. 1989), which is why this Court has frequently held claims containing limitations missing from the prior art invalid for obviousness as a matter of law. *E.g.*, *C.R. Bard*, 2021 WL 3574043, at *4-5; *W. Union*, 626 F.3d at 1371-72; *Tokai*, 632 F.3d at 1372; *Perfect Web*, 587 F.3d at 1330-32; *Merck*, 874 F.2d at 807-09; *cf. CRFD*, 876 F.3d at 1345-49 (obviousness as a matter of law; the Board "legally erred" in treating obviousness like anticipation).  Here, as in those cases, the lack of express disclosure reflects triviality, not nonobviousness.

Take the Board's reliance on the fact that "Sperle discloses performing a 'check' to determine whether a course 'has a valid license,' but does not provide any details for that license check."  Appx26 (quoting Appx1139 ¶ 16).  The Board failed to consider that Sperle does not provide such detail precisely because, as is undisputed, verifying licenses was well-known in the art.  *See, e.g.*, Appx48 (1:23-27), Appx49 (3:19-21) ('113 patent on access control); Appx1159 ¶ 6 (Madison on the "industry standard"); Appx1164-1165 ¶ 72 (Madison disclosing

"log[ging] in to an authorization application"). Given that background
knowledge, the inference that the Board should have drawn from
Sperle's omission of detail is that the implementation of such a check—
including its sequencing—amounted to nothing more than design choice
between "'predictable variation[s].'" *C.R. Bard*, 2021 WL 3574043, at
*4-5 (quoting *KSR*, 550 U.S. at 417); *see* Appx1148 ¶ 61 (Sperle
explaining that "permutations of [its] embodiments and methods will be
apparent to those skilled in the art"); *cf. Chiron Corp. v. Genentech, Inc.*,
363 F.3d 1247, 1254 (Fed. Cir. 2004) ("[A] patentee preferably omits
from the disclosure any routine technology that is well known at the
time of application.").

The Board's treatment of Madison was similarly flawed. The
Board fixated on the fact that Madison discloses an embodiment in
which a location designator (the URL in Madison's redirector file) is
provided before license verification (Madison's ticket matching),
whereas the claimed sequencing requires the reverse. Appx26-27. But
a skilled artisan reading Madison would hardly feel constrained by
Madison's described sequencing. Again, Madison explains that its
system "may be implemented in many manners," disavows limitation to

its "exemplary embodiments and examples," Appx1167 ¶ 98, and notes that its "tickets need not be generated at precise times," Appx1166 ¶ 87. Likewise, Madison's claims do not require the redirector file to be generated or to receive a URL before license verification. Appx1167-1169. Meanwhile, the Board did not find—and OpenSesame did not argue—that reversing Madison's described sequencing "offered any unexpected results or was not reasonably expected to succeed." *Perfect Web*, 587 F.3d at 1331; *supra* 16-18, 29-30. Indeed, providing access to materials after verifying authorization is a commonplace order of operations, as countless examples demonstrate. *Supra* 26-27. Here, where "[i]n both the claimed invention and in [the prior art], the [system] is operated via sequential action of" the same two predictable events, "a mere reversal in the order of these actions does not confer patentability." *Tokai*, 632 F.3d at 1372.

**2.** The Board compounded the problem of its rigid adherence to the express disclosures of Sperle and Madison by demanding that Go1's expert provide affirmative, technically detailed testimony explaining "why a skilled artisan would go beyond what is taught in Madison and

35

provide the URL [in Madison's redirector file]" after rather than before license verification.  Appx29.  This demand has three legal defects.

First, the Board "demand[ed] too much" because there was no need to "identify [a] specific 'affirmative reason'" for a skilled artisan to reverse Madison's sequencing.  *Philips Lighting*, 727 F. App'x at 682.  Motivation requires showing merely that an option would have been "suitable."  *PACT*, 61 F.4th at 1381.  Thus, it sufficed that reversing Madison's sequencing was one of "just two obvious design choices" for restricting access to authorized users.  *Philips Lighting*, 727 F. App'x at 682; *see, e.g.*, *Uber*, 957 F.3d at 1339; *Tokai*, 632 F.3d at 1372; *Perfect Web*, 587 F.3d at 1331.

Second, expert testimony was not required.  Because verifying licenses was undisputedly well-known and predictable, swapping the order of Madison's steps to match the conventional sequencing of verifying first was a matter of "logic, judgment, and common sense" that was available "in lieu of expert testimony."  *Wyers*, 616 F.3d at 1239; *accord Perfect Web*, 587 F.3d at 1329.  Again, the Board assumed that that the prior art taught everything in the claims except the precise sequencing of the two steps at issue.

Third, "[w]hile not necessary in this case," Go1 "submitted expert evidence" that "fully supports" reversing Madison's sequencing. *Perfect Web*, 587 F.3d at 1330. Go1's expert testified that a skilled artisan would view the sequencing between Madison and the claimed invention as "insubstantially different." Appx1492 ¶ 91. And OpenSesame neither "rebut[ted] [this] obviousness testimony nor provide[d] contradictory evidence." *Perfect Web*, 587 F.3d at 1330; *supra* 16-17, 29-30.

To be sure, the Board dismissed Go1's expert testimony as "conclusory." Appx29. But the Board's bases for this finding do not withstand scrutiny.

To start, the Board premised the finding on the mistaken notion that Go1's expert testimony was "not supported by any evidence contemporaneous with the claimed invention." Appx29. The Board was incorrect that there was no other evidence supporting that, circa 2010, verifying first would have been an obvious design choice. *See* Appx48 (1:23-27), Appx49 (3:19-21) ('113 patent recognizing that access control was known); Appx1159 ¶ 6 (Madison recognizing same); Appx1164-1165 ¶ 72 (similar); Appx676-677, Appx680-681 ¶¶ 79-80, 85-86 (Go1's expert

testifying that "controlled delivery of remote learning content" was a "well-known problem" and that both Sperle and Madison "involve[d] routine software functionality" that was "reasonably predictable to implement"); Appx2625-2626 (OpenSesame's expert offering an example of licensing in the e-learning context from 1985); *supra* 26-27 (longstanding and everyday examples of verifying first (citing *PersonalWeb*, 8 F.4th at 1317-80; *Ericsson*, 955 F.3d at 1327)); *see also* Appx9-10 (level of ordinary skill).

The Board also premised the finding on a misplaced demand that Go1's expert provide a "technical explanation" for his conclusion. Appx29. Technical explanation was not required when OpenSesame did not even contend, let alone provide evidence, that technical difficulties stood in the way. *See Perfect Web*, 587 F.3d at 1330-31; *supra* 16-17, 29-30. OpenSesame's expert's mere testimony that Sperle and Madison did not disclose the claimed sequencing, *supra* 16-17, 29-30, was beside the point. *See Wyers*, 616 F.3d at 1239; *Perfect Web*, 587 F.3d at 1331; *supra* 32-35. Further, Go1's expert testimony was no less detailed than expert testimony in *Perfect Web* that sufficed to invalidate software claims for obviousness as a matter of law. *Compare* Appx1492

¶ 91 (Go1's expert testifying that a skilled artisan would view reversing the method steps here "as insubstantially different," which would not have prevented motivation to combine with a reasonable expectation of success to "achiev[e] the purported invention of the claims"), *with Perfect Web*, 587 F.3d at 1330 (relying on expert testimony that "it would have been obvious" to repeat method steps).

\* \* \*

Taking a step back confirms that the Board asked for too much. The Board assumed that Sperle and Madison taught every aspect of the claims except the sequencing of the "providing a location designator" limitation, then rejected obviousness solely based on that sequencing. In other words, the Board concluded that a skilled artisan equipped with a proxy, a location designator, and well-known license-verification techniques would not have tried verifying a user's license before providing the location designator to the proxy to provide access to teaching content, despite that sequencing's conformance to the tried-and-true method of verifying credentials before providing access to restricted materials. That defies common sense.

## CONCLUSION

This Court should reverse the Board's motivation-to-combine finding and remand for further consideration of Go1's obviousness challenge. At a minimum, this Court should vacate and remand on the question of motivation to combine.

September 9, 2024

Respectfully submitted,

*/s/ Robbie Manhas*

Elizabeth R. Moulton
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
405 Howard Street
San Francisco, CA 94105

Robbie Manhas
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 339-8400

Bas de Blank
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025

*Counsel for Appellant*

# ADDENDUM

Final Written Decision,
   Paper No. 32, filed February 26, 2024 ....................................... Appx1

U.S. Patent No. 8,784,113 ............................................................. Appx39

Trials@uspto.gov                                                    Paper 32
571-272-7822                                          Entered: February 26, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

GO1 PTY, LTD.,
Petitioner,

v.

OPENSESAME, INC.,
Patent Owner.

_____

IPR2022-01439
Patent 8,784,113 B2

_____

Before STACY B. MARGOLIES, THU A. DANG, and KEVIN C. TROCK,
*Administrative Patent Judges*.

MARGOLIES, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining No Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

In this *inter partes* review, instituted pursuant to 35 U.S.C. § 314, GO1 Pty, Ltd. ("Petitioner") challenges the patentability of claims 1–16 of U.S. Patent No. 8,784,113 B2 (Ex. 1001, "the '113 patent"), owned by OpenSesame, Inc. ("Patent Owner"). We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons discussed below, Petitioner has not shown by a preponderance of the evidence that claims 1–16 of the '113 patent are unpatentable.

## A. Procedural History

GO1 Pty, Ltd. ("Petitioner") filed a petition for *inter partes* review of claims 1–16 of U.S. Patent No. 8,784,113 B2 (Ex. 1001, "the '113 patent"). Paper 1 ("Pet."). OpenSesame, Inc. ("Patent Owner") filed a Preliminary Response. Paper 5 ("Prelim. Resp."). On February 27, 2023, we instituted an *inter partes* review of claims 1–16 of the '113 patent on the following grounds:

2

IPR2022-01439
Patent 8,784,113 B2

| Claims Challenged | 35 U.S.C. §[1] | References/Basis |
|---|---|---|
| 1–16 | 103 | Sperle,[2] Madison[3] |
| 7, 8 | 103 | Sperle, Madison, Kimball[4] |

Subsequent to institution, Patent Owner filed a Patent Owner Response (Paper 12, "PO Resp."), Petitioner filed a Reply (Paper 14, "Reply"), and Patent Owner filed a Sur-reply (Paper 19, "Sur-reply"). Also, Patent Owner filed a Contingent Motion to Amend (Paper 11, "MTA"), Petitioner filed an Opposition to the MTA (Paper 15, "MTA Opp."), we issued Preliminary Guidance on the MTA (Paper 18, "Preliminary Guidance" or "PG"), Petitioner filed a Reply to the Preliminary Guidance (Paper 20, "MTA Reply"), and Patent Owner filed a Sur-reply regarding the Preliminary Guidance (Paper 24, "MTA Sur-reply").

Petitioner relies on the Declaration of Kevin Almeroth (Ex. 1002) and the Reply Declaration of Kevin Almeroth (Ex. 1024). Patent Owner relies on the Supplemental Declaration of Bryan Bergeron, MD (Ex. 2002).

We held an oral argument on November 28, 2023. A copy of the transcript of that argument was entered into the record. Paper 31 ("Tr.").

---

[1] The Leahy-Smith America Invents Act ("AIA") amended 35 U.S.C. §§ 102, 103. *See* Pub. L. No. 112-29, 125 Stat. 284, 285–88 (2011). Because the effective filing date of the challenged claims is before March 16, 2013 (the effective date of the relevant amendments), the pre-AIA version of § 103 applies.

[2] U.S. Patent Application Publication No. 2007/0111180 A1, published May 17, 2007 (Ex. 1005).

[3] U.S. Patent Application Publication No. 2004/0015703 A1, published Jan. 22, 2004 (Ex. 1006).

[4] U.S. Patent Application Publication No. 2006/0204942 A1, published Sept. 14, 2006 (Ex. 1007)

3

## B.  Related Matters

The parties identify the following judicial proceeding in which the '113 patent is asserted and which may affect, or be affected by, a decision in this proceeding:  *OpenSesame, Inc. v. GO1 Pty, Ltd.*, Case No. 3:21-cv-01258-SB (D. Oregon).  Pet. 2; Paper 4, 2; *see* 37 C.F.R. § 42.8(b)(2).

## C.  Real Parties in Interest

The parties identify only themselves as real parties in interest.  Pet. 2; Paper 4, 2.

## D.  The '113 Patent

The '113 patent is titled "Open and Interactive E-Learning System and Method."  Ex. 1001, code (54).  The '113 patent describes as background that learning management systems (LMSs) conventionally are "closed learning systems" in which access is "one-way rather than interactive, i.e.[,] individual students each review the teaching content in its 'canned' form."  *Id.* at 1:23–36.  The '113 patent notes that "[t]he Sharable Content Object Reference Model (SCORM) and Aviation Industry Computer-Based Training Committee (AICC) standards claim to offer . . . an interoperable e-learning content standard [but] do not guarantee interoperability."  *Id.* at 1:59–62.  The '113 patent adds that vendors use AICC to "centrally host and manage content" but "do not provide for secure but distributable central storage of a broad range of content."  *Id.* at 2:7–14.

The '113 patent describes a system (called "OPENSESAME") to solve the above problems by "abstracting the actual courseware (e.g., e-learning course content) from the LMS via a proxy SCORM package (called 'SESAMESEED')."  *Id.* at 2:49–62.  The proxy "enforce[s] access control," "provide[s] access to the latest version(s) of the content,"

4

IPR2022-01439
Patent 8,784,113 B2

"provide[s] status updates to the LMS system," and "relieve[s] the LMS
system of the burden of hosting and playing the content." *Id.* at 2:52–62.

Figure 3 of the '113 patent is shown below.



**Figure 3**

Learner launches course from his/her LMS

Figure 3, above, illustrates the OPENSESAME system architecture
and highlights how a learner would use the system. *Id.* at 2:19–30, 3:14–23.
OPENSESAME system 10 includes OPENSESAME catalog (e.g.,
e-learning course catalog) 12, OPENSESAME licensing and reporting server

5

IPR2022-01439
Patent 8,784,113 B2

(e.g., a digital rights management server) 14, content delivery network (CDN) 16, OPENSESAME player (e.g., content player) 18, and payment system 20. *Id.* at 3:17–23. User system 22 includes SESAMESEED proxy 24, LMS 26, author 28, training manager 30, and learner 32. *Id.* at 3:23–26.

The '113 patent discloses that "the SESAMESEED proxy bridges the network-side and the client-side, originating and interacting with the network-side, but being stored and executed during operation at the client side." *Id.* at 7:8–11. According to the patent, "this dual nature" of the proxy "enables several of the enhanced capabilities of the invented system and method." *Id.* at 7:11–13. In Figure 3 above, "the SESAMESEED exists both in the LMS (at 3a) and in the learner's browser (3b), acting as the link between the invented System 10, the learner 32, and the LMS 26." *Id.* at 8:58–63.

As illustrated in Figure 3, at 3a, the learner requests a course from the learner's LMS and the LMS responds with the location of the course. *Id.* at 8:64–67. At 3b, the learner requests the course, and the learner's browser loads the course, which is "actually a SESAMESEED proxy provided from the LMS." *Id.* at 9:1–4. At 3c, the proxy makes a licensing request to the licensing/reporting server, which returns either a script containing a player URL or a signal indicating that access is denied. *Id.* at 9:5–11. At 3d, if authorization succeeds, the proxy instructs the learner's web browser to load the player URL, and, once loaded, the player instructs the learner's browser to load the course content from the CDN. *Id.* at 9:18–22. At 3e, the learner's browser requests content from the CDN and the content is loaded from the CDN into the user's browser. *Id.* at 9:28–30.

6

IPR2022-01439
Patent 8,784,113 B2

### *E. Illustrative Claim*

Among the challenged claims (claims 1–16), claims 1, 5, and 11 are independent.  Claim 1 reads as follows, with the key limitation emphasized:

> 1.  An e-learning delivery system, comprising:
>
> a licensing/reporting server;
>
> a network-side content player operably coupled with each of the licensing/reporting server and a content delivery network comprising stored e-learning content; and
>
> a proxy comprising coded instructions stored on a non-transitionary computing device-readable medium at the network-side, wherein the proxy instructions identify a specific instance of licensed content, and wherein the proxy instructions are configured when executed on a client-side computing device to enable a user to access and interact with the licensed content via a browser of the computing device and are further configured to report a status of the user's interaction with the content to one or both of the licensing/reporting server and a learning management system (LMS);
>
> wherein the licensing/reporting server includes coded instructions configured when executed to cause the licensing/reporting server to verify a validity status of the user license to the specific instance of content, and ***upon verifying the validity of the license, the instructions are further configured to cause the licensing/reporting server to provide to the proxy a location designator for accessing the content player***;
>
> wherein the proxy instructions are further configured, when executed on the client-side computing device in response to a request for access to the specific instance of content, to:
>
> cause the client-side computing device to request verification by the licensing/reporting server of the validity status of a license to the specific instance of content; and
>
> cause the client-side computing device to instruct a browser to access the content player via the location designator; and

7

> wherein the proxy instructions are further configured to relay information to a client-side Learning Management System (LMS) including information indicating a status of content played by the content player.

*Id.* at 16:48–17:19 (emphasis added).

Independent claims 5 and 11 include a limitation similar to the one emphasized above. Claim 5 recites "[a] method for delivering e-learning standard-complaint content, comprising: . . . ***providing, from the licensing/reporting server to the proxy in response to a successful license verification request received from the proxy, the content player location designator***." Claim 11 recites "[a]n e-learning proxy comprising: instructions stored on a non-transitory computing-device-readable medium, wherein the instructions are configured when executed on a computing device to cause the computing device to: . . . ***receive from the licensing/reporting server, in response to a successful verification of the license, a location designator for a content player***."

## II. DISCUSSION

### A. *Principles of Law*

To prevail in its challenge to Patent Owner's patent claims, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to

8

IPR2022-01439
Patent 8,784,113 B2

each claim")).  The burden of persuasion never shifts to Patent Owner.  *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (citing *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1326–27 (Fed. Cir. 2008)) (discussing the burden of proof in *inter partes* review).

A claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time of the invention to a person having ordinary skill in the art.  *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations including the following:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) objective evidence of nonobviousness.  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).  "A determination of whether a patent claim is invalid as obvious under § 103 requires consideration of all four *Graham* factors, and it is error to reach a conclusion of obviousness until all those factors are considered."  *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1048 (Fed. Cir. 2016) (en banc) (citations omitted).  "This requirement is in recognition of the fact that each of the *Graham* factors helps inform the ultimate obviousness determination."  *Id.*

## B.  Level of Ordinary Skill

Petitioner asserts that a person having ordinary skill in the art would have had "a bachelor's degree in electrical engineering, computer engineering, computer science, or a related field, and at least two years of experience in the research, design, development, and/or testing of systems

9

for delivering educational content over networks such as the Internet, or the equivalent, with additional education substituting for experience and vice versa." Pet. 8 (citing, e.g., Ex. 1002 ¶ 41).

Patent Owner states that it "generally agrees with Petitioner's proposed level of ordinary skill in the art." PO Resp. 10. Patent Owner adds that "the level of ordinary skill in the art is more often premised not upon obtaining a formal degree in computer engineering, computer science, etc., but through years of hands-on experience in the field, often coupled with formal coursework that may or may not lead to a degree in the enumerated fields." *Id.* at 11 (citing, e.g., Ex. 2002 ¶ 18).

We determine that the level of ordinary skill proposed by Petitioner is consistent with the challenged patent and the asserted prior art, and we therefore adopt that level.

## C. Claim Construction

In an *inter partes* review based on a petition filed on or after November 13, 2018, we apply the same claim construction standard that would be used in a civil action under 35 U.S.C. § 282(b), following the standard articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). 37 C.F.R. § 42.100(b) (2020); 83 Fed. Reg. 51,340, 51,340–41, 51,343 (Oct. 11, 2018). In applying such standard, claim terms are generally given their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art, at the time of the invention and in the context of the entire patent disclosure. *Phillips*, 415 F.3d at 1312–13. "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution

IPR2022-01439
Patent 8,784,113 B2

history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

Neither party proposes express constructions for any claim terms. *See* Pet. 8 ("To resolve the particular grounds presented in this Petition, Petitioner does not believe that any term requires explicit construction."); PO Resp. 11 ("Patent Owner believes that the patent claims at issue can be interpreted without the need for the formal construction of any claim terms.").

We determine that no claim terms require express construction in order to analyze the patentability issues presented.

### D. Asserted Obviousness over Sperle and Madison

Petitioner asserts that claims 1–16 of the '113 patent are unpatentable as obvious over the combination of Sperle and Madison. Pet. 3, 15–73. As explained below, Petitioner does not persuasively show that claims 1–16 are unpatentable as obvious over the combination of Sperle and Madison.

### 1. Summary of Sperle

Sperle is a U.S. patent application publication titled "Delivery Methods for Remote Learning System Courses." Ex. 1005, code (54). Sperle discloses that "enterprises are often faced with the challenge of lifelong learning to train a (perhaps globally) distributed workforce, update partners or suppliers about new products and developments, [and] educate apprentices or new hires." *Id.* ¶ 2. According to Sperle, many companies must identify third-party providers to provide the necessary training and identify courses that are relevant to their employees, "which can be time consuming and costly." *Id.* Sperle discloses a system that proposes learning

11

IPR2022-01439
Patent 8,784,113 B2

units based on a learner's personal data, tracks progress through courses, and coordinates the personalized learning experience. *Id.* ¶ 11.

Figure 1 of Sperle is shown below.



*FIG. 1*

Figure 1, above, illustrates environment 100 for learning management system (LMS) 140. *Id.* ¶ 11. Sperle discloses that environment 100 "is typically a distributed client/server system that spans one or more networks such as external network 112 or internal network 114." *Id.* ¶ 13. Environment 100 includes server 102a and one or more learners 104 or other users on clients. *Id.* Environment 100 also is communicably coupled with external content provider 108 and external learning management system 145 via external network 112. *Id.* ¶¶ 11, 13. According to Sperle, training administrator 105 may customize teaching scenarios by using web services to integrate external content from external content provider 108 or external learning management system 145. *Id.* ¶ 11. Internal server 102a includes

12

local memory 137, which includes local course catalog 142a and course profiles 144. *Id.* ¶¶ 14, 15.

Sperle discloses that "course catalog 142 includes information indicating specific checks that may be performed for a course," such as whether the course "has a valid license." *Id.* ¶ 16. Internal server 102a also includes enterprise resource planning (ERP) solution 135, which may implement analytics that enable the entity or user to evaluate performance and analyze operations. *Id.* ¶ 18. According to Sperle, LMS 140 is often fully integrated with ERP solution 135. *Id.* ¶ 19. Sperle discloses that LMS 140 "offers robust reporting capabilities, including ad hoc reporting and business intelligence." *Id.* ¶ 11.

Figure 2 of Sperle is shown below.



*FIG. 2*

Figure 2 illustrates an implementation of LMS 140. *Id.* ¶ 28. Sperle discloses that "[r]eporting functions 214 . . . keep track of learners' learning activities and the associated costs at all times." *Id.* ¶ 34. According to Sperle, "[t]here is a wide range of reporting options available in training

13

IPR2022-01439
Patent 8,784,113 B2

management to enable the trainer to keep track of participants, rooms, course locations, and so on." *Id.*

## 2. Summary of Madison

Madison is a U.S. patent application publication titled "System and Method for Controlling Access to Digital Content, Including Streaming Media." Ex. 1006, code (54). Madison discloses that "streaming media may be used for any of a number of purposes, including . . . distance learning." *Id.* ¶ 4. According to Madison, a streaming media server "typically includes a software plug-in of compiled code that contains the logic for determining whether or not to grant access to the streaming media." *Id.* ¶ 6. Such an authentication plug-in, according to Madison, "is often complicated and difficult to develop and maintain." *Id.*

Madison discloses an improved system in which a web server "cryptographically generates a ticket in response to an end user's request for access to a file." *Id.* ¶ 8. Madison discloses that, "[p]rior to a media server providing access to the requested file, the media server generates an authorization ticket, preferably using the same cryptographic algorithm as the web server." *Id.* ¶ 9. According to Madison, "[t]he media server determines whether to grant access to the file by comparing the ticket, as generated by the web server, to the ticket, as generated by the media server." *Id.* If the tickets match, the media server grants the end user access to requested media content. *Id.* ¶ 10.

IPR2022-01439
Patent 8,784,113 B2

Figure 6 of Madison, below, shows an embodiment of the system. *Id.*
¶ 16.



As illustrated in Figure 6 above, the system includes end user
processors 602, one or more streaming media servers 604, one or more web
servers 606, playlist server 610, and database 608, all of which couple to the
Internet or other network. *Id.* ¶ 68.

Madison describes the steps for granting access to a streaming media
file as follows: An end user requests access to a playlist having one item of
secure content. *Id.* ¶ 72. Web server 606 provides a web page requesting
the end user to log in to an authorization application. *Id.* In response, the
end user provides the end-user's user ID and credit card information and
requests access to a particular streaming media content file. *Id.* Web server

15

606, in turn, generates an authorization ticket by applying a private key (obtained from database 608), stream ID, end user ID and time values. *Id.* ¶¶ 75, 76. Web server 606 returns the ticket and end user ID to the web browser running on end user processor 602. *Id.* ¶ 76. A script running on end user process 602 then causes a call to be made to playlist server 610. *Id.* ¶ 79.

Playlist server 610 generates a redirector file, such as an ASX file. *Id.* The playlist server then passes the ASX redirector file to the media player at end user processor 602. *Id.* ¶ 81. An example redirector file is shown below (*id.*):

```
<ASX>
    <ENTRY>
        <REF href="mms://mediaserver.company.com/stream 1 .asf?
            ID=123456&TICKET=uvw123xyz& USER_ID=abc
            123def">
    <ENTRY>
<ASX>
```

As illustrated above, Madison's example redirector file includes a URL prefix (mms://), a host name of the appropriate media server (mediaserver.company.com), the filename (stream1.asf), the requested item of content stream ID (123456), the ticket, and the end user ID. *Id.*

According to Madison, after end user processor 602 receives the ASX file, end user process 602 requests the streaming media content by making a call to mediaserver.company.com, as identified in the ASX file. *Id.* ¶ 83. In response, streaming media server 604 proceeds to determine whether or not to grant the end user access to the requested content. *Id.* ¶ 84. Specifically, streaming media server 604 independently generates an authentication ticket and compares it to the ticket generated by web server 606. *Id.* If a ticket

16

generated by media server 604 matches the ticket generated by web server
606, media server 604 grants the end user access to the requested content.
*Id.*

### 3. Analysis

#### a. Independent claim 1

Petitioner does not establish that the combination of Sperle and
Madison teaches the limitation of claim 1 that the licensing/reporting server
includes coded instructions configured such that, "upon verifying the
validity of the license, . . . cause the licensing/reporting server to provide the
proxy a location designator for accessing the content player." Petitioner
does not rely on either reference for teaching this limitation. Rather,
Petitioner asserts that a person of ordinary skill in the art "would have
considered it obvious." Pet. 44 (citing Ex. 1002 (Almeroth Decl.) ¶ 136). In
its Reply, Petitioner reinforces its reliance on testimony beyond the
teachings of the references, asserting that an ordinarily skilled artisan would
not require Madison to specify instructions that operate in a manner identical
to this limitation because a skilled artisan is a person of ordinary creativity,
not an automaton. Pet. Reply 12 (citing *KSR*, 550 U.S. at 421; Ex. 1024
(Almeroth Reply Decl.) ¶¶ 90–91). As explained below, Petitioner relies on
unsupported, conclusory testimony from Dr. Almeroth to fill in gaps in the
prior art references. We therefore determine Petitioner does not meet its
burden in showing claim 1 is unpatentable as obvious over Sperle and
Madison.

We first describe Petitioner's contentions regarding the applicable
claim limitations, and then we address why Petitioner's showing regarding
the location designator limitation is insufficient.

IPR2022-01439
Patent 8,784,113 B2

> i. *Petitioner's contentions—licensing/reporting server*

Claim 1 recites an e-learning delivery system that includes "a licensing/reporting server." Petitioner asserts that the combination of Sperle and Madison teaches the claimed licensing/reporting server. Pet. 22–28; Ex. 1002 ¶¶ 90–101. Petitioner's combination can be illustrated by the following annotated figures from the Petition. First, shown below are Petitioner's annotated Figures 1 and 2 from Sperle (Pet. 23):





As illustrated above, Petitioner annotates Figures 1 and 2 from Sperle to identify reporting module 214 (in red), which is part of the server-side Learning Management System 140 (in light blue). Pet. 23.

18

Petitioner combines Madison's teaching of authorization software that determines whether to grant or deny access to specific content with Sperle's teachings regarding the reporting module, as illustrated by Petitioner's figure below (Pet. 28):



*FIG. 2*

Illustrated above is Petitioner's modification of Sperle Figure 2 to include (in red) the licensing/reporting server taught by the combination of Sperle and Madison. Pet. 28. Petitioner asserts that a person of ordinary skill in the art would have readily integrated Madison's web server with authorization software and media server with similar authorization software into the reporting module of Sperle, obtaining a licensing/reporting server as claimed. Pet. 26–28; Ex. 1002 ¶¶ 99–101.

  *ii. Petitioner's contentions—network-side content player*

Claim 1 recites that the e-learning delivery system also includes "a network-side content player operably coupled with each of the licensing/reporting server and a content delivery network comprising stored e-learning content." Petitioner argues that the combination of Sperle and Madison teaches the network-side content player. Pet. 28–31; Ex. 1002

IPR2022-01439
Patent 8,784,113 B2

¶¶ 102–108.  Petitioner relies on the following annotated versions of Sperle Figures 1 and 2 (Pet. 29):



*FIG. 1*    *FIG. 2*

Illustrated above are Petitioner's annotated Figures 1 and 2 to of Sperle to illustrate (in red) that the network-side LMS 140 includes Content Player 208.  Pet. 29.  According to Petitioner, Sperle discloses that content player 208 is coupled to (i) reporting module 214, which as modified by the combination with Madison is the claimed licensing/reporting server, through core 202; and (ii) content delivery network (network 112 in Figure 1) through Learning Content 220.  Pet. 28–30; Ex. 1005, Figs. 1, 2; Ex. 1002 ¶ 104.

### iii. Petitioner's contentions—proxy comprising coded instructions that identify a specific instance of licensed content

Claim 1 also recites that the e-learning delivery system includes "a proxy comprising coded instructions stored on a non-transitory computing device-readable medium at the network-side, wherein the proxy instructions identify a specific instance of licensed content."

Petitioner asserts that the combination of Sperle and Madison teaches the claimed proxy in that a skilled artisan would have been motivated to use Madison's access control software and redirector file with Sperle's system

20

IPR2022-01439
Patent 8,784,113 B2

components to enforce licensing restrictions placed on the e-learning content and to identify a specific instance of that content. Pet. 32–38; Ex. 1002 ¶¶ 109–122.

Petitioner relies on Sperle's teaching of an Enterprise Resource Planning (ERP) solution, as illustrated in Petitioner's annotation of Sperle Figure 1 below (Pet. 33):



*FIG. 1*

Shown above is Petitioner's annotation of Sperle Figure 1 to illustrate (in red) the ERP solution, which according to Petitioner implements functionalities of LMS 140 and may be stored and executed both on the network and remotely on a user terminal. Pet. 33–34.

Petitioner also relies on Madison's teaching that—in response to a user requesting certain streaming media—the network-side playlist server "generates a redirector file" that "contains a link to the requested content, along with the ticket and public key (i.e., stream ID and end user ID)." Pet. 36–37 (citing Ex. 1006 ¶¶ 72–79). Petitioner asserts that a person of

21

ordinary skill in the art "implementing Sperle would have utilized the access control software from Madison, including Madison's redirector file and the network-side software that creates it, as the claimed proxy instructions." *Id.* at 37 (citing Ex. 1002 ¶¶ 121–122). According to Petitioner, a person of ordinary skill in the art "would have been motivated to utilize Madison's network-side proxy instructions, including its various access-control software and redirector file, to achieve the access restrictions and distribution improvements discussed by Madison (*i.e.*, to enforce licensing restrictions place on the e-learning content) and to identify the specific instance of that licensed content." *Id.* (citing Ex. 1002 ¶ 121).

*iv. Petitioner's contentions—verify a validity status of the user license*

Claim 1 further recites "wherein the licensing/reporting server includes coded instructions configured when executed to cause the licensing/reporting server to **verify a validity status of the user license** to the specific instance of content."

Petitioner relies on the combination of Sperle and Madison for teaching this claim limitation. Pet. 41–43; Ex. 1002 ¶¶ 129–133. Specifically, Petitioner relies on Sperle's discussion of "licenses and encryption generally" and on Madison for "specific implementation details." Pet. 41. Petitioner maintains that Madison teaches a series of steps (which would have been implemented as coded instructions on the licensing/reporting server) between a user request and the ultimate provision of media, including verifying the validity of a user's access request. *Id.* at 41–42 (citing Ex. 1006 ¶¶ 68–97). Petitioner cites to step 522 of Madison's Figure 5 as disclosing a check for whether a streaming server

IPR2022-01439
Patent 8,784,113 B2

ticket matches a web server ticket. Pet. 42–43. Petitioner further illustrates

Madison's teachings by annotating Madison's Figure 5 as follows (Pet. 43):



Illustrated above is Petitioner's annotated version of Madison

Figure 5, with red boxes showing the options of providing or denying access

to media content based on a check of whether the streaming server ticket

matches the web server ticket. Pet. 43; Ex. 1006, Fig. 5.

Petitioner further explains in its Reply how "Madison's software

causes the client device to request verification of the license":

23

IPR2022-01439
Patent 8,784,113 B2

> After logging into the system, the end user requests "access to
> the particular streaming media content file" by sending a
> "stream request" to the web server, which, in turn, "issues a
> request to the database 108 for the private key for use in
> generating the authorization ticket." When the user accesses
> the redirector file in its browser to access the requested content,
> the "authorization ticket" is provided back to the network for
> verification. Upon receiving this authorization ticket
> information, "streaming media server 104 either denies or
> provides access to the requested streaming media content based
> on a comparison of the tickets as generated by the streaming
> media server 104 and web server 106."

Pet. Reply 10–11 (citations omitted).

Petitioner therefore relies—for the verifying the validity of the
license—on Madison's teachings of a sequence of steps in which a redirector
file is sent to a user *before* the streaming media server determines whether to
deny or grant access.

> *v.  Petitioner's contentions—providing a location designator*

Claim 1 further recites that the licensing/reporting server includes
coded instructions such that, "***upon verifying the validity of the license***, the
instructions are further configured to ***cause the licensing/reporting server to
provide to the proxy a location designator*** for accessing the content player."

Petitioner asserts that the combination of Sperle and Madison teaches
this limitation. Pet. 44–45. Specifically, Petitioner asserts that the
combination of Sperle and Madison "teaches coded instructions in the
licensing/reporting server configured to provide Madison's redirector file
(i.e. the claimed 'proxy') with a location designator for accessing the content
player." *Id.* at 44. According to Petitioner, a person of ordinary skill in the
art "would have considered it obvious that the licensing/reporting server
would provide a location designator URL to the redirector file proxy for

24

accessing content because each piece of content contains an unique ID that is generated by the licensing/reporting server." *Id.* (citing Ex. 1006 ¶ 81). Petitioner adds that "[t]he user device in Madison uses the URL in the redirector file to direct the user device to the media server." *Id.* (citing Ex. 1006 ¶ 91).

In support of the Petition, Petitioner's declarant, Dr. Almeroth, does not add anything beyond what is stated in the Petition, other than noting that the URL links in Madison's redirector file are the claimed location designators for accessing content. Ex. 1002 ¶¶ 134–136. Neither Petitioner nor Dr. Almeroth address the claim requirement of "upon verifying the validity of the license." *See* Pet. 44–45.

In its Reply, Petitioner responds to Patent Owner's argument that, in Madison, the validity of the license is verified *after* the redirector file (which includes a location designator (URL)) is generated and thus the steps in Madison are in the reverse order from the claim requirement of verifying license validity *before* providing a location designator. Pet. Reply 12 (citing PO Resp. 33). Petitioner's response is as follows:

> These arguments fail because a [person of ordinary skill in the art] would not require Madison to specify "proxy instructions" that operate in an identical manner to limitation [1.f] to be motivated to combine the disclosures of Sperle-Madison with a reasonable expectation of success in achieving the purported claimed invention. A [person of ordinary skill in the art] is a person of ordinary creativity, not an automaton. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). Moreover, there is no material difference—and [Patent Owner] does not identify one—between the request for streaming media content, in combination with an authorization ticket that is provided back to the network for verification, and "request[ing] verification … of the validity status of a license to the specific instance of content." Nor does [Patent Owner] explain what consequences

25

exist, if any, for the "steps in Madison" being in "reverse order compared to the claim element." [A person of ordinary skill in the art] would have viewed these alleged differences, if any exist, as inconsequential, and they would not prevent a motivation to combine Sperle and Madison.

Pet. Reply 12–13.

Petitioner therefore reiterates in its Reply that it is relying on the ordinary creativity of a skilled artisan and not any express disclosure in Sperle or Madison for establishing that it would have been obvious for the licensing/reporting server (Madison's server authorization software integrated into Sperle's reporting module) to have instructions that, *upon verifying the validity of the license*, cause the licensing/reporting server to provide to the proxy (redirector file and authorization software) a location designator (URL) for accessing the content player.

### vi. Analysis

Petitioner's assertions and testimonial evidence are not sufficiently supported by the references or contemporaneous evidence to establish that the "location designator" limitation would have been obvious to one of ordinary skill in the art considering the teachings of Sperle and Madison. We agree with Patent Owner that Petitioner's showing for this claim limitation is insufficient. *See* PO Resp. 32–38; PO Sur-reply 13–15; Ex. 2002 ¶¶ 107–124.

First, Petitioner does not rely on any express disclosure in Sperle or Madison for this limitation. Pet. 44–45. Sperle discloses performing a "check" to determine whether a course "has a valid license" (Ex. 1005 ¶ 16), but does not provide any details for that license check, as Petitioner acknowledges (Pet. 40–44). Madison discloses generating a redirector file

26

IPR2022-01439
Patent 8,784,113 B2

that includes a URL pointing to the media server to access the content. Ex. 1006 ¶¶ 77–82. However, that URL is placed in the redirector file *before* the web server compares authorization tickets to determine whether the user is licensed to the requested content. *Id.* ¶¶ 77–84; Ex. 2002 ¶¶ 107–124. According to Madison, a redirector file is generated first, sent back to the user, and then when the user uses the redirector file to access the content, the media server determines whether or not to grant the end user access to the request. Ex. 1006 Fig. 5, ¶¶ 77–84. It is this last step of determining whether to grant access that Petitioner relies on for teaching the "verifying a validity status of the user license" limitation of claim 1. Pet. 41–43. Thus, Madison does not disclose "upon verifying the validity of the license," causing a licensing server "to provide to a proxy a location designator" for accessing the content player. *See* Ex. 2002 ¶¶ 115–120, 123–124.

Petitioner acknowledges that Madison teaches generating a redirector file with the URL *before* the authorization check, but asserts that it does not matter because the key inquiry under *KSR* is whether a person ordinarily skilled in the art—"a person of ordinary creativity, not an automaton"—would have been motivated to combine the disclosures in Sperle and Madison to achieve the claimed invention. Pet. Reply 12. In the Petition, Petitioner relies on Dr. Almeroth to provide such an explanation. Pet. 45 (citing Ex. 1002 ¶ 136).

Dr. Almeroth, however, does not provide a persuasive explanation. Dr. Almeroth first says that a person of ordinary skill in the art "would have considered it obvious that the licensing/reporting server would provide a location designator URL to the redirector file proxy for accessing content because each piece of content contains a unique ID that is generated by the

27

licensing/reporting server." Ex. 1002 ¶ 136. Dr. Almeroth then points to the URL link in the redirector file and states that the user device in Madison uses the URL in the redirector file to direct the user device to the media server. *Id.* Neither of these statements address the requirement in the claim that, "upon verifying the validity of the license," the instructions are configured to "cause the licensing/reporting server to provide to the proxy" the URL. Dr. Almeroth then testifies that a person of ordinary skill in the art "would have understood that, in the combined system, the content would be accessed via Sperle's content player 208, such that the reference to the media server in the ASX URLs would point to the network location of Sperle's content player 208." *Id.* This statement addresses only the last portion of the claim limitation.

Thus, the Petition and supporting evidence (Dr. Almeroth's declaration testimony) do not address the entirety of the location designator claim limitation.

On reply, Petitioner relies on additional testimony from Dr. Almeroth. Pet. Reply 13 (citing Ex. 1024 ¶¶ 90–91). Dr. Almeroth opines that "[t]here is no practical difference between the request for streaming media content, in combination with an authorization ticket that is provided back to the network for verification; and 'request[ing] verification . . . of the validity status of a license to the specific instance of content.'" Ex. 1024 ¶ 90. According to Dr. Almeroth, a person of ordinary skill in the art "would view them as insubstantially different, if at all, and would still be motivated to combine Sperle and Madison." *Id.* Dr. Almeroth adds that "there is no reason why the combination would not be an obvious design choice." *Id.* Dr. Almeroth also testifies that "there is no clear significance to the fact that

28

IPR2022-01439
Patent 8,784,113 B2

the 'steps in Madison' are in 'reverse order compared to the claim element'"
and that a skilled artisan "would view them as insubstantially different, if
different at all, and would still be motivated to combine Sperle and
Madison." *Id.* ¶ 91.

Dr. Almeroth's testimony does not persuasively show why a person of
ordinary skill in the art—considering the teachings of Sperle and Madison—
would have performed the redirector file creation and authorization
differently from what Madison teaches such that, upon determining that the
user was authorized, the URL is provided from the licensing server to the
proxy, as required by the claim. Petitioner relies on Madison's disclosures
regarding the redirector file for teaching other elements of the claim—the
proxy and the verifying of the validity status of the user license—yet fails to
provide a persuasive analysis for why a skilled artisan would go beyond
what is taught in Madison and provide the URL to the proxy "upon verifying
the validity of the license" rather than prior to that verification. Dr.
Almeroth does not point to design considerations at the time of the invention
to show why the differences between the art and claimed invention are
"insubstantially different" or that the modification would merely be a
"design choice." Ex. 1024 ¶¶ 90–91. Rather, Dr. Almeroth provides
conclusory testimony that is not supported by any evidence
contemporaneous with the claimed invention. In fact, Dr. Almeroth does not
provide any technical explanation for his generic conclusions. The evidence
of record is simply insufficient for us to conclude that an ordinarily skilled
artisan would have come up with the claimed invention in view of the
teachings of Sperle and Madison.

Petitioner therefore fails to establish that the combination of Sperle and Madison teaches to one of ordinary skill in the art the limitation of claim 1 of "wherein the licensing/reporting server includes coded instructions when executed to cause the licensing/reporting server to verify a validity status of the user license to the specific instance of content, and ***upon verifying the validity of the license***, the instructions are further configured to ***cause the licensing/reporting server to provide to the proxy a location designator for accessing the content player***."

*vii. Conclusion regarding claim 1*

For the above reasons, Petitioner does not persuasively show that the subject matter of claim 1 would have been obvious over the combination of Sperle and Madison.

*b.  Dependent claims 2–4*

Claims 2–4 depend from claim 1.  Petitioner relies on its analysis of the limitations recited in claim 1 when addressing dependent claims 2–4. Pet. 50–54.  Therefore, for the reasons explained above in connection with claim 1, Petitioner does not persuasively show that the subject matter of claims 2, 3, or 4 would have been obvious over the combination of Sperle and Madison.

*c.  Independent claim 5*

Claim 5 (a method claim) recites a location designator limitation similar to that of claim 1 (a system claim).  Specifically, claim 5 recites "providing, from the licensing/reporting server to the proxy ***in response to a successful license verification request received from the proxy***, the content player location designator."  Petitioner primarily relies on the same analysis for this limitation as it does for the corresponding limitation in claim 1, but

30

IPR2022-01439
Patent 8,784,113 B2

adds additional discussion that similarly does not persuasively address the
"in response to a successful license verification request" requirement.  Pet.
56–57; Pet. Reply 19.

Petitioner asserts that Madison teaches this limitation of claim 5.
Pet. 56 (citing Ex. 1002 ¶¶ 162–163).  Petitioner maintains that, "[a]s
discussed above for element [1.f.], Madison teaches that, upon verifying the
validity of the license, the licensing/reporting server . . . provides, to the
proxy, a location designator for accessing the content player."  *Id.* at 56–57.
Petitioner states that "[s]uch a success response is show in Madison's Figure
5, element 538."  *Id.* at 57.  Petitioner again points to the red highlighted
boxes from Madison's Figure 5 below as it does for the license verification
limitation of claim 1 (*compare* Pet. 57*, with* Pet. 43):

IPR2022-01439
Patent 8,784,113 B2



FIG. 5

Shown above is Petitioner's annotated version of Madison Figure 5, highlighting in red box 538 for providing access to media content after determining that tickets match (and the user is authorized). Pet. 57. The highlighted boxes, along with step 522, illustrate determining whether or not the user is authorized (i.e., verifying the validity of the license), but do not address the other portions of the claim limitation.

Petitioner asserts that a person of ordinary skill in the art "would have understood that, because the content is played network-side in Sperle by content player 208, and not delivered as part of the proxy to the user, the

32

reporting/licensing server must provide the end-user with a location designator URL." *Id.* at 57. Thus, according to Petitioner, an ordinarily skilled artisan "would have considered it obvious that the licensing/reporting server would provide a location designator URL to the redirector file proxy for accessing content." *Id.* (citing Ex. 1002 ¶ 163). Dr. Almeroth does not provide any additional analysis other than what is stated in the Petition. *See* Ex. 1002 ¶¶ 162–163; Ex. 1024 ¶ 110.

As explained above in connection with claim 1, Petitioner's analysis does not address the entirety of the limitation, which requires "in response to a successful license verification request received from the proxy," providing from the licensing/reporting server to the proxy the content player location designator. Madison discloses a different sequence: generating a redirector file with a content player location designator, sending that redirector file to the user, verifying that the user is authorized to have access, and then granting that access. Neither Petitioner nor Dr. Almeroth explain how the combination of Sperle and Madison teaches the specific order required by the claim limitation. In addressing the claim 5 limitation, Petitioner separately addresses portions of the limitation, but does not address the entirety of the limitation that dictates that the location designator is provided "in response to a successful license verification request."

For these reasons and for the reasons explained above in connection with claim 1, Petitioner does not show that the subject matter of claim 5 would have been obvious over the combination of Sperle and Madison.

### d. Dependent claims 6–10

Claims 6–10 depend directly or indirectly from claim 5. Petitioner relies on its analysis of the limitations recited in claim 5 when addressing

dependent claims 6–10. Pet. 62–66. Therefore, for the reasons explained above in connection with claim 5, Petitioner does not persuasively show that the subject matter of any of claims 6–10 would have been obvious over the combination of Sperle and Madison.

### e. Independent claim 11

Claim 11—directed to an e-learning proxy comprising instructions stored on a non-transitory computing-device-readable medium—recites a location designator limitation similar to that recited in claim 1 (system claim) and claim 5 (method claim). Specifically, claim 11 recites that the instructions are configured when executed on a computing device to cause the computing device to "receive from the licensing/reporting server, *in response to a successful verification of the license*, a location designator for a content player." Petitioner relies on the same analysis for this limitation as it does for the corresponding limitation in claim 1. Pet. 67–68; Pet. Reply 19; Ex. 1002 ¶ 183. Neither Petitioner nor Dr. Almeroth provide any additional analysis beyond the analysis for claim 1.

As explained above in connection with claim 1, neither Sperle nor Madison discloses a licensing/reporting server sending a location designator for a content player "in response to a successful verification of the license." *See infra* Section II.D.3.a.vi. Petitioner relies on unsupported, conclusory testimony from Dr. Almeroth to show that this feature would have been obvious to a person of ordinary skill in the art in view of the teachings of Sperle and Madison. *Id.* For the reasons explained above in connection with the "location designator" limitation of claim 1—the analysis of which Petitioner relies on for this similar limitation in claim 11—Petitioner does

not establish that the subject matter of claim 11 would have been obvious over the combination of Sperle and Madison.

### f. Dependent claims 12–16

Claims 12–16 depend from claim 11. Petitioner relies on its analysis of the limitations recited in claim 11 when addressing dependent claims 12–16. Pet. 70–73. Therefore, for the reasons explained above in connection with claim 1 and 11, Petitioner does not persuasively show that the subject matter of any of claims 12–16 would have been obvious over the combination of Sperle and Madison.

### E. Asserted Obviousness over Sperle, Madison, and Kimball

Petitioner also asserts that claims 7 and 8 of the '113 patent are unpatentable as obvious over the combination of Sperle, Madison, and Kimball. Pet. 3, 73–76. Claims 7 and 8 depend directly or indirectly from claim 5. Claim 7 recites that the content delivery method of claim 5 further comprises "receiving at the licensing/reporting server a rating of e-learning content provided from a user." Claim 8 depends from claim 7 and adds the step of "storing the rating information at a network-side catalog operably coupled with the licensing/reporting server."

Petitioner relies on Kimball for its teaching of a rating system. *Id.* at 73–76. Petitioner relies on its analysis of claim 5 for the limitations of that claim that are incorporated into claims 7 and 8. *Id.* at 75–76.

For the reasons explained above in connection with claim 5, Petitioner does not persuasively show that the subject matter of claims 7 or 8 would have been obvious over the combination of Sperle, Madison, and Kimball.

IPR2022-01439
Patent 8,784,113 B2

### F.  Patent Owner's Contingent Motion to Amend

Patent Owner filed a contingent motion to amend, asserting that "should any of claims 1, 5, and 11 survive the inter partes review, Patent Owner requests that this contingent motion to amend be considered moot and no substitute claims entered." MTA 1.  Because we determine that Petitioner has not established that any of independent claims 1, 5, and 11—indeed, any of the challenged claims 1–16—are unpatentable, Patent Owner's motion to amend is moot.

### III.  CONCLUSION

For the reasons explained above, Petitioner does not show that claims 1–16 are unpatentable as obvious over Sperle and Madison or that claims 7 and 8 are unpatentable as obvious over Sperle, Madison, and Kimball.

The table below summarizes our conclusions as to the challenged claims.

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–16 | 103 | Sperle, Madison | | 1–16 |
| 7, 8 | 103 | Sperle, Madison, Kimball | | 7, 8 |
| **Overall Outcome** | | | | 1–16 |

### IV.    ORDER

Accordingly, it is

ORDERED that, based on a preponderance of the evidence, claims 1–16 of U.S. Patent No. 8,784,113 B2 have not been shown to be unpatentable; and

36

IPR2022-01439
Patent 8,784,113 B2

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

37

IPR2022-01439
Patent 8,784,113 B2

FOR PETITIONER:

Benjamin Haber
William M. Fink
Carolyn Wall
O'MELVENY & MEYERS LLP
bhaber@omm.com
tfink@omm.com
cwall@omm.com

FOR PATENT OWNER:

Wilmore F. Holbrow III
Benjamin C. Deming
Jason W. Croft
BUCHALTER, APC
wholbrow@buchalter.com
bdeming@buchalter.com
jcroft@buchalter.com

38



US008784113B2

(12) **United States Patent**
Bridges et al.

(10) Patent No.: **US 8,784,113 B2**
(45) Date of Patent: **Jul. 22, 2014**

(54) **OPEN AND INTERACTIVE E-LEARNING SYSTEM AND METHOD**

(76) Inventors: **Aaron H Bridges**, Portland, OR (US);
**Jason S Day**, Spokane, WA (US);
**Joshua D Blank**, Portland, OR (US);
**Donald S Spear**, West Linn, OR (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 184 days.

(21) Appl. No.: **13/156,607**

(22) Filed: **Jun. 9, 2011**

(65) **Prior Publication Data**

US 2011/0306027 A1     Dec. 15, 2011

**Related U.S. Application Data**

(60) Provisional application No. 61/397,797, filed on Jun. 15, 2010.

(51) **Int. Cl.**
*G09B 7/00* (2006.01)

(52) **U.S. Cl.**
USPC ............................................. **434/322**; 726/27

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2002/0078050 | A1 | 6/2002 | Gilmour |
| 2003/0084345 | A1 * | 5/2003 | Bjornestad et al. ........... 713/201 |
| 2003/0175676 | A1 * | 9/2003 | Theilmann et al. ............ 434/350 |
| 2004/0015565 | A1 * | 1/2004 | Bednar et al. ................. 709/219 |
| 2004/0148408 | A1 * | 7/2004 | Nadarajah .................... 709/229 |
| 2005/0132020 | A1 * | 6/2005 | Gorbet et al. ................. 709/217 |
| 2005/0132207 | A1 * | 6/2005 | Mourad ........................ 713/189 |
| 2005/0136388 | A1 * | 6/2005 | de Saint-Aignan et al. .. 434/350 |
| 2005/0203931 | A1 * | 9/2005 | Pingree et al. ................ 707/100 |
| 2006/0068368 | A1 * | 3/2006 | Mohler et al. ................. 434/362 |

| | | | |
|---|---|---|---|
| 2006/0099564 | A1 * | 5/2006 | Bohle et al. ................... 434/350 |
| 2006/0235813 | A1 * | 10/2006 | Chakraborty .................. 706/20 |
| 2007/0100882 | A1 * | 5/2007 | Hochwarth et al. ....... 707/104.1 |
| 2007/0101331 | A1 * | 5/2007 | Krebs ........................... 718/101 |
| 2007/0143751 | A1 * | 6/2007 | Butler et al. .................. 717/174 |
| 2007/0196803 | A1 * | 8/2007 | Goodrich ...................... 434/323 |
| 2008/0160491 | A1 * | 7/2008 | Allen et al. ................... 434/362 |
| 2008/0213741 | A1 * | 9/2008 | Redd et al. .................... 434/365 |
| 2009/0197234 | A1 * | 8/2009 | Creamer et al. ............... 434/350 |
| 2009/0197238 | A1 * | 8/2009 | Moffatt et al. ................ 434/430 |
| 2010/0250653 | A1 * | 9/2010 | Hudgeons et al. ............. 709/203 |
| 2010/0285781 | A1 * | 11/2010 | Dai et al. .................... 455/414.1 |
| 2012/0052475 | A1 * | 3/2012 | Carman ........................ 434/350 |

FOREIGN PATENT DOCUMENTS

WO      WO 2005055174  A1 *  6/2005

OTHER PUBLICATIONS

International Search Report for Int'l Patent App. No. PCT/US2011/39966 dated Oct. 3, 2011 ( 8 pgs.)

* cited by examiner

*Primary Examiner* — Venkat Perungavoor
*Assistant Examiner* — Christopher Ruprecht
(74) *Attorney, Agent, or Firm* — Rick Boyd; Paul Heynssens; Ater Wynne LLP

(57) **ABSTRACT**

A system and method are described that provide nearly universal and simple access by learners everywhere to content developed by authors everywhere to produce an e-learning marketplace. Content is stored and updated centrally and current content is distributed to local content servers via a content delivery network (CDN). A proprietary server enables interfaces and a loadable seed to a user server connected with one or more learning management systems (LMSs). Training managers subscribe to content, the author obtains payment, and the learners 'attend' one or more courses, the completion status and grade of which are reportable to the one or more LMSs. Security is provided as is interaction among various users of the invented e-learning system and method.

**16 Claims, 8 Drawing Sheets**





**Figure 1**

Author uploads course and metadata to
OPENSESAME™



**Figure 2**

Training Manager purchases course and
downloads SESAMESEED to install in his/
her LMS. Author is paid for purchase.



**Figure 3**

Learner launches course from his/her LMS



**Figure 4**

Training Manager or Learner rates course.



**Figure 5**

Information exchange and browser detail



**Figure 6**

SESAMESEED SCORM Detail



**Figure 7**

SESAMESEED AICC Detail



**Figure 8**
OPENSESAME™ Business Model

US 8,784,113 B2

<table>
<tr><td>

1

**OPEN AND INTERACTIVE E-LEARNING
SYSTEM AND METHOD**

RELATED APPLICATIONS

This application claims the benefit of priority to U.S. Provisional Patent Application No. 61/397,797 filed on Jun. 15, 2010 and entitled OPEN AND INTERACTIVE E-LEARNING SYSTEM AND METHOD, the entire contents and disclosure of which are hereby incorporated herein by this reference.

FIELD OF THE INVENTION

The invention relates generally to the field of on-line learning systems. More particularly, the invention relates to on-line learning systems in which content is readily publishable by a teacher and is readily accessible by a student via platform-independent means.

BACKGROUND OF THE INVENTION

Learning management systems (LMSs) conventionally are closed learning systems by which a corporation makes teaching content available on-line to employees who are authorized to subscribe thereto under management mandate or permission. Typically, such teaching content is stored in complex forms on central servers, and access thereto most often requires the involvement of an LMS's information technology (IT) department to decode and debug. Thus each attempted e-learning content access requires a customized effort with expensive and expert involvement. Such access tends to be one-way rather than interactive, i.e. individual students each review the teaching content in its 'canned' form without any ability to interact with the author or an instructor or peers, and without any ability to critique, update, question, or otherwise affect the teaching content. Even the author or instructor of the on-line content in accordance with traditional systems does not have any update, revision, or augmentation control over the content after it is data-based (e.g., stored) in a central server that forms part of the LMS. Thus, loss of access by a learner or student, and loss of control by an author or instructor of courseware, characterizes the conventional LMS e-teaching/e-learning model.

Content delivery networks (CDNs) conventionally provide application-specific on-line content, e.g. music via ITUNES™ (ITUNES is a trademark owned by Apple Computer, Inc.). However, those with skill in the art will appreciate that downloading and playing music from ITUNES is unidirectional and non-interactive, in that a track is simply downloaded, played, and listened to, requiring and enabling no response or feedback or other reverse communication from the listener back to the source of the downloaded content. Those with skill in the art also will appreciate that worldwide musical digital content formats (e.g., MP3, etc.) provide universal formatting standards for such music downloads, thus simplifying the players that are designed for musical download systems.

The Sharable Content Object Reference Model (SCORM) and Aviation Industry Computer-Based Training Committee (AICC) standards claim to offer such an interoperable e-learning content standard. Unfortunately, in practice they do not guarantee interoperability. Newer standards are periodically released that require LMS systems to also be updated. Moreover, content that is claimed to conform to the standards may not be deliverable on every standards-compliant LMS due to differences in LMS system programmers' or

</td><td>

2

content authors' interpretation of the standard or programming errors that only arise when a specific SCORM or AICC package is delivered through a specific LMS. Further, once most SCORM or AICC courses are loaded into an LMS they must be manually updated, which makes it generally impossible for a course author or content provider to control or track content once it has been deployed. Those with skill in the art will appreciate that vendors of some products, for example SKILLSOFT™ (SKILLSOFT is a trademark owned by Skillsoft Ireland Limited), use AICC to centrally host and manage content. Nevertheless, they do not provide for secure but distributable central storage of a broad range of content. Moreover, SKILLSOFT may require a technical integration with the IT team, which can be costly and complex.

BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. **1**, **2**, **3**, and **4** collectively illustrate block diagrams of the system architecture and highlight various uses that characterize the system and method, according to an embodiment of the invention. More particularly, FIG. **1** highlights how an author would use the invented system; FIG. **2** highlights how a training manager would use the invented system; FIG. **3** highlights how a learner would use the invented system; and FIG. **4** illustrates the interaction and feedback mechanisms by which a learner or training manager provide course feedback to the author or other prospective buyers, e.g. by rating a course, collaborating in a discussion of the course, participating in a study group, etc.

FIG. **5** illustrates an information exchange model by which the system and method operate, in accordance with an embodiment of the invention.

FIG. **6** illustrates a runtime block and flow diagram of the system (e.g., OPENSESAME) architecture and highlights the role of the proxy (e.g. SESAMESEED) part thereof, using SCORM, in accordance with an embodiment of the invention.

FIG. **7** illustrates a runtime block and flow diagram of the system (e.g., OPENSESAME) architecture and highlights the role of the proxy (e.g. SESAMESEED) part thereof, using AICC, in accordance with an embodiment of the invention.

FIG. **8** illustrates a monetization and business model enabled by the invented system and method, according to an embodiment of the invention.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The invented system and method solve the above-identified problems by, for example, abstracting the actual courseware (e.g., e-learning course content) from the LMS via a proxy SCORM package (called 'SESAMESEED'). In accordance with one embodiment of the invention, the SESAMESEED proxy is loaded into an LMS and communicates with the system (called 'OPENSESAME') to enforce access control, to provide access to the latest version(s) of the content (or current version, if desired), to provide status updates to the LMS system, and to relieve the LMS system of the burden of hosting and playing the content (which may be large files and implement a different SCORM or AICC version, or may even be incompatible with the LMS due to inconsistent or incorrect implementation of such a 'standard'). As used herein, a 'SCORM package' generally refers to a set of coded instructions configured when executed to perform a designated task or set of tasks within a SCORM-compliant environment, system, device, etc. Examples include the SESAMESEED proxy, content for a course (e.g., 'courseware'), etc.

</td></tr>
</table>

US 8,784,113 B2

3 4

An ordinarily skilled artisan will appreciate that the present invention is not intended to be limited to the use of any particular standard content wrapper or definition. Thus, references herein to a SCORM implementation are simply for purposes of illustration and not restriction. Those with skill will appreciate that the use of SCORM, AICC or any other suitable standard—including a future proprietary or open source standard that might gain traction and might become widely accepted—is contemplated as being within the spirit and scope of the invention.

OPENSESAME™ and SESAMESEED™ are trademarks owned by the assignee of the present invention, namely Blue Tech LLC, all rights reserved world-wide.

FIGS. **1-4** collectively illustrate the architecture of invented system **10** and highlight four different use models or use phases of the invented system including data and control, flow and interaction. The invented OPENSESAME system **10** may be seen to include an OPENSESAME catalog **12** (e.g., e-learning course catalog), an OPENSESAME licensing and reporting (licensing/reporting) server **14** (e.g., a digital rights management (DRM) server), a content delivery network (CDN) **16**, an OPENSESAME player **18** (e.g., content player), and a payment system **20**. The invented user system **22** may be seen to further include a SESAMESEED proxy **24**, an LMS **26**, an author **28**, a training manager **30**, and a learner **32**. The OPENSESAME catalog **12** provides the interface for uploading of content from author **28**, and for browsing, purchasing, rating and obtaining a copy of SESAMESEED proxy **24** by training manager **30** for loading into LMS **26**.

Those with skill in the art will appreciate that SESAMESEED proxy **24** resides and executes typically in invented user system **22**, but actually forms an important part of invented OPENSESAME system **10** in accordance with one embodiment of the invention. This unique system architecture by which a non-OPENSESAME-server-resident component of OPENSESAME system **10** resides and executes on user system **22** is indicated in FIGS. **1-4** by two crooked dashed lines.

When author **28** uploads content, he or she is able to add metadata to the course (e.g., to the course description, etc.) to assist one or more training managers **30** in browsing and identifying relevant courseware. Author **28** also provides a so-called "zip" (compressed) file containing SCORM- or AICC-compliant courseware. Files in the course package (e.g. a 'SCORM package' when configured for SCORM compliance) are processed to allow them to be delivered within the SCORM runtime via one or more CDNs. A current copy of the courseware is then placed on the one or more CDNs **16** where it can be accessed by one or more authorized learners **32** via their customer LMS **26** and the SCORM or AICC runtime provided by OPENSESAME player **18**. As used herein, a "Learner" (or learner) is typically a student or employee, etc., who has been assigned an e-learning activity by a training manager or elects to begin an e-learning activity made available through an LMS. The learner generally interacts with the invention through their web browser, into which may be loaded files from an LMS and/or the invented OpenSesame system. As used herein, a "user" can be either of a learner or a training manager, and is typically a customer for e-learning courses and/or content within the invented system and method.

When a training manager **30** purchases a course, a license record is inserted into licensing and reporting (licensing/reporting) server **14**. The one or more learners **32** can then simply launch the course from one or more corresponding LMSs **26**, and interact with the course content. "Launching"

an e-learning course typically refers herein to the learner's interaction with a web browser that begins the delivery of the course. This is typically done by clicking a link in the LMS system that identifies the specific course being delivered.

A suitable LMS can include, for example, SUMTOTAL (from SumTotal Systems), BLACKBOARD (from Black-Board Inc.) and CORNERSTONE LMS (from CornerStone On Demand). According to several exemplary embodiments, suitable players of SCORM content may include but are not limited to RUSTICI SCORMENGINE (from Rustici Software), ICODEON SCORM Player (from Icodeon Ltd.), or other SCORM players developed for and/or provided for use with a commercial LMS system such as those listed above.

Conventional techniques for delivering (e.g., playing, displaying, etc.) content from a CDN require the player and the content to be served from the same domain. Some CDNs permit this, but it is expensive and nontrivial to configure. In order to play SCORM content, for example, in this fashion, the browser's security model must be taken into account. Specifically, the web browser does not allow script calls between pages on different domains, so the invented OPENSESAME system and method process the content, injecting a script that instructs the web page to set its own domain indicator (document.domain) to the same domain that the player will be served from, before providing the content to (and/or storing the content at) the CDN. An embodiment of this novel solution involves the content and player being served from domains that share a common root domain, e.g. content.opensesame.com and cdn.content.opensesame.com. Thus, the invention solves problems and avoids restrictions and complexities of conventional CDN-based content-playing techniques. In at least another embodiment, a CDN aggregates traffic under a single domain using a reverse-proxy server configuration.

The licensing/reporting server **14** provides authorization and licensing services, and aggregates status reports regarding the learners **32** progress in the course. licensing/reporting server **14** also tracks content access for the purpose of restricting access to authorized users such as author **28**, training manager **30**, and/or learner **32**. When an access request is made, licensing/reporting server **14** records the request, logging which user and license (e.g., a key used to look up LMS customer, course, and purchase information) seeks access. Licensing/reporting server **14** then compares those values to its license store. If the requesting user is permitted according to a favorable comparison, then licensing/reporting server **14** returns in its response a location designator, for example a uniform resource locator (URL), and/or other parameters necessary for the SESAMESEED proxy **24** to make a request to play content on the OPENSESAME player **18**. For example, the proxy can already include the URLs designating one or more players, and the response indicates parameters that the proxy can use to load an appropriate (e.g., selected, content-compatible, etc.) player for the e-learning course and/or content.

According to a typical embodiment, "playing" e-learning course content refers to supplying learner-perceivable course content files (html, images, video) and standard runtime (SCORM, AICC, future standard to emerge) functions to a learner's browser and tracking the learner's progress through the course to the satisfaction of the completion criteria defined by the course author, for example, when packaging the content. If access is denied, a signal is sent to the user's browser to display a warning message on the user device (e.g. a desktop, laptop or notebook computer, an IPAD™, a per-

US 8,784,113 B2

5

6

sonal digital assistant (PDA), a smart phone, etc.), rather than playing, delivering or otherwise providing access to the requested content.

The CDN **16** is a storage and retrieval mechanism for the courseware provided by one or more authors **28**. A suitable CDN can be nearly any commercial or proprietary content delivery network. Examples of commercial CDNs include but are not limited to AKAMAI (from Akamai Technologies), EDGECAST (from EdgeCast Networks, Inc.) and COTENDO (from Contendo Inc.). Proprietary CDNs can include those developed and/or otherwise established for access and use primarily or solely within, for example, an educational institution or system, a corporate entity (e.g., company), a government agency, etc.

In accordance with one embodiment of the invention, the OPENSESAME system **10** employs standard security schemes provided by CDNs including time-based access, signing/hashing of URL parameters with a shared key, etc.

The OPENSESAME player **18** provides standardized, e.g. SCORM and/or AICC, runtime support for playing content provided to the OPENSESAME system **10** by content author **28**. The OPENSESAME player **18** also provides status updates to the licensing/reporting server **14** and the SESAMESEED proxy **22**, which in turn provides status updates to the LMS **26**. It is this mechanism that enables the abstraction of the content runtime ('runtime abstraction') from the LMS runtime. An ordinarily skilled artisan will appreciate that the OPENSESAME player **18** is embodied as either or both of a server system and a set of instructions providing runtime functionality resident in the learner's web browser.

The SESAMESEED proxy **22** is a standards-based, e.g. SCORM or AICC, module representing purchased content (e.g., a course) provided on-demand to a user (e.g., training manager **30**) for loading into his or her LMS **26**. The SESAMESEED proxy is initially stored on a tangible computing-device-readable medium at the network-side, typically at the licensing/reporting server **14**, in a template form that does not yet include instructions relating to a specific instance of content. However, once a course is purchased by a user (e.g., a training manager, etc.), a SESAMESEED proxy will be configured to include instructions that relate to a specific instance of content, for execution by a client-side computing device. A SESAMESEED proxy so configured typically remains stored at the server-side until being conveyed to a user as described below. Those with skill in the art will appreciate that loading the proxy need happen only once per purchased license.

Reference herein to a "specific instance of content" generally means that the instructions in the SESAMESEED proxy allow the proxy to be used only within the scope of the specifically purchased license stored at the licensing/reporting server **14**. The license scope may define access to one or more specific courses or specific modules of a course, to a specific user or limited number of users, to a specific number of times played/accessed, or to another limitation or combination of limitations. For example, a specific instance of content can include instructions enabling access to a particular course by all employees in a corporation. Conversely, a specific instance of content can include access to a specified grouping (e.g., list) of courses by only one or more specified persons or groups of persons. Therefore, an ordinarily skilled artisan will recognize that while the scope of a specific instance of content is limited by the instructions in the SESAMESEED proxy, such instructions can be configured according to nearly infinite combinations each representing a separate specific instance of content.

An ordinarily skilled artisan will also appreciate that the training manager can simply update the license (e.g., by pur-

chasing additional seats) on the server to permit more users ('seats') to access the course. Additionally, the training manager may load the SESAMESEED proxy **22** into one or more other LMS systems and access the same seats purchased. These and other approaches are contemplated as being within the spirit and scope of the invention.

From the perspective of the LMS **26**, SESAMESEED proxy **24** is a SCORM or AICC course, but those with skill will appreciate that the SESAMESEED proxy does not contain the actual content. Instead, in accordance with one embodiment of the invention, the SESAMESEED proxy **24** contains a licensing identifier that, along with the user and course identifier provided by LMS **26**, are passed to licensing/reporting server **14** by the SESAMESEED proxy when learner **32** acts to launch an OPENSESAME course (see above detailed description of licensing/reporting server **14** for description of the authorization process).

If the authorization is successful, the SESAMESEED proxy **24** prompts the user's browser to load the provided URL to the OPENSESAME player **18**, the player prompts the user's browser to load the URL to the content on the CDN, and the user interacts with the course content via the user's browser. The SESAMESEED proxy **24** remains resident in the browser and acts as a proxy, relaying status changes from the player **18** back to the customer LMS **26**. In another embodiment, status changes are relayed from the player **18** through the SESAMESEED proxy **24** and back to the customer LMS **26**. In one embodiment, status changes are sent from the player **18** to the LMS system directly. In one embodiment of the invention, the SESAMESEED proxy **24** relays the following SCORM runtime values: cmi.core.lesson_status, cmi.core.score.raw, cmi.core.session_time. Those of ordinary skill in the art will recognize that the values passed back to the customer LMS **26** will vary depending upon the specific standard that the SESAMESEED proxy **24** implements.

In addition, the user can rate the course, and the rating is passed through the OPENSESAME player **18** to the licensing/reporting server **14** where it can be accessed by catalog **12** and provided, in aggregate, to prospective customers as well as to the author of the course.

Those with skill in the art will appreciate that the numbered and lettered reference designators described below by reference to FIGS. **1-7** are intended to be illustrative and not limiting. Specifically, the numbered and lettered reference designators do not necessarily indicate chronology or order, and should not be so interpreted as a limitation of the invention, the scope of which will be determined by the claims.

Additionally, as diagrammatically represented in FIGS. **1-4**, the invented system and method operates within each of (and across) a 'client-side' and a 'network-side.'Generally, although not exclusively, "client-side" refers to the devices and/or operations of a training manager or a learner, typically including an LMS. From a viewpoint of a provider of the invented system, the client-side represents the customer for e-learning courses.

Conversely, the network-side represents the provider(s) of e-learning courses and/or systems for accessing and interacting with such courses and/or content. The network-side in an exemplary but non-limiting embodiment includes, for example, a licensing/reporting server, a content player, a catalog, and a CDN. A payment system, when present, is also typically represented on the network side.

The network-side and client-side components of the invented system and method are operably coupled and exchange information across a data-transfer network in a typical but not exclusive embodiment. Therefore, one or more of the client-side components can be remotely located from

one or more of the network-side components, although a local area network can also be used, and the one or more client-side components can be located locally relative to the one or more network-side components. Therefore, an ordinarily skilled artisan will recognize that the physical location of the various system components does not determine whether such components are considered client-side or network-side.

Unique to the invented system, the SESAMESEED proxy bridges the network-side and the client-side, originating and interacting with the network-side, but being stored and executed during operation at the client-side. It is this dual nature of the SESAMESEED proxy that enables several of the enhanced capabilities of the invented system and method.

Those with skill in the art will appreciate that various "users" (broadly defined and also referred to alternatively herein as "customers") include authors/instructors, training managers, and/or learners/students who make various uses of the system capabilities resulting in various interactions, data and control paths and flows, etc., as described below by reference to FIGS. 1-4. Because such users have different goals and roles in the use of the invented system, they tend to have different tools at their disposal, as will be described by reference below to their respective user devices.

Briefly previewing, those with skill will appreciate that the embodiments depicted in FIGS. 1-4 are identical in terms of the identically numbered functional blocks and users they feature, but that FIGS. 1-4 are different in terms of the actions performed by the functional blocks and users featured. Thus, those with skill in the art will appreciate that different interaction lines representing actions and information passing between and among the various blocks and users are represented in four different use models (or use phases), in accordance with the invented system and method. This will become clear from the following description. Note: the arrows in FIGS. 1-6 indicate conveyance of a request, a response, instructions, content, or another type of information, for example, from one block or user to another. The direction of each arrow indicates the direction of each conveyance, from the originating block or user to the receiving block or user. Likewise, double-ended arrows indicate a bi-directional conveyance, such as in a request and response interaction, an exchange of information during operation of the invented method, or some other similarly bi-directional interaction. In FIGS. 1-4, the SESAMESEED is positioned in the center of the document to illustrate its role as a bridge between the OPENSESAME and customer systems. As is described below, the actual location of the SESAMESEED changes during the course of at least one usage scenario, from within the licensing/reporting server 14 to the customer LMS 26 and/or the learner's device 32.

FIG. 1 illustrates an author's use of invented system 10. The several operations of the invented method are scripted below by reference to their numbered and lettered reference designators. In FIG. 1, the SESAMESEED is depicted with dashed borders to indicate that it initially exists as a proxy template residing at the licensing/reporting server 14, rather than as a fully configured and functional proxy. The SESAMESEED proxy template generally includes all information and/or instructions necessary for it to function within the invented system as intended, except that it does not yet include information and/or instructions corresponding to a specific license (e.g., to a particular course or other specific instance of content) purchased by a user.

At 1a, an author provides a course (e.g., as a zip file) and metadata to the OPENSESAME catalog.

At 1b, the OPENSESAME catalog stores license information in the licensing/reporting server.

At 1c, the OPENSESAME catalog processes the content and stores it on one or more CDNs.

Those with skill in the art will appreciate that, within the spirit and scope of the invention, author 28 also can update his or her content stored at a central location (e.g. via CDN 16), and such updated content becomes immediately available on-line to the other users including training manager 30 and learner 32 by a 'push' from the CDN to its distributed content servers, or by a 'pull' by distributed content servers from the content origin. Thus, those with skill also will appreciate that author 28 need not contact or otherwise communicate with anyone or everyone who has already loaded the content into their one or more LMSs 26 to provide the updated content or to notify them regarding the updates, although such notifications can be optionally provided. Therefore, e-learning content is not only accessible to all, but e-learning content can also be very simply updated once or more to maintain its perpetual currency.

FIG. 2 illustrates a training manager's use of invented system 10. In this usage scenario, license identifiers are added (2b) to the SESAMESEED proxy template, and the resulting SESAMESEED proxy is then delivered to the training manager's device (2c) and is finally uploaded to the LMS (2e). Therefore, the SESAMESEED is represented with solid borders indicating that it exists as a functional entity within the client-side as depicted in FIG. 2. For descriptive convenience, the SESAMESEED proxy is interchangeably referred to herein as simply the SESAMESEED.

At 2a, a customer (e.g., a training manager) chooses a course (or other content) to purchase and provides payment information.

At 2b, the OPENSESAME catalog system requests that the licensing/reporting server create a license for the training manager 30, which is then stored at the licensing/reporting server.

At 2c, the training manager sends a request to the licensing/reporting server which in response provides to the training manager a SESAMESEED proxy corresponding to the purchase.

At 2d, the licensing/reporting server makes a payment request to the payment system (e.g., to pay the author an agreed upon amount that is due from the purchase of the course/content). Those with skill in the art will appreciate that, in practice, the OPENSESAME system may hold the payment for a period of time before paying the author, to ensure against charge-backs, etc.

At 2e, the training manager loads the SESAMESEED proxy into his or her LMS.

At 2f, the payment system delivers payment to the author.

Those with skill in the art will appreciate that, in accordance with the invention, the training manager 30 can additionally suggest a course, or suggest a topic, or can request customization from a specific author, etc. All such augmentations to the invented system and method are contemplated as being within the spirit and scope of the invention.

FIG. 3 illustrates a learner's (or student's) use of invented system 10. In FIG. 3, the SESAMESEED is represented with solid borders indicating that it exists as a functional entity. In the usage scenario of FIG. 3, the SESAMESEED exists both in the LMS (at 3a) and in the learner's browser (3b), acting as the link between the invented System 10, the learner 32, and the LMS 26.

At 3a, the learner requests a course from his or her LMS by clicking on a link or otherwise acting to launch a course or learning object. The LMS responds with the location of the course.

US 8,784,113 B2

9

At 3*b*, the learner requests and the learner's browser loads the course, which in accordance with one embodiment of the invention is actually a SESAMESEED proxy provided from the LMS.

At 3*c*, the SESAMESEED proxy makes a licensing request to the licensing/reporting server, which then returns a script containing a player URL, instructions in the form of JAVAS-CRIPT™ (JAVASCRIPT is a trademark owned by Oracle Corporation), or another machine-readable code and associated parameters. Alternatively, the licensing/reporting server returns a signal indicating that access is denied. Those with skill in the art will recognize that by delivering instructions in the form of code from the server to the SESAMESEED proxy, rather than embedding them directly into the SESAMESEED proxy, allows for changes to be made to the code without the training manager having to re-upload the SESAMESEED proxy into their LMS after each change.

At 3*d*, if authorization succeeds (i.e. the user is allowed to launch the course), then the SESAMESEED proxy instructs the learner's web browser to load the player URL. Once loaded, the player 18 instructs the learner's browser to load from the CDN the content corresponding to the course. The URLs to the content are constructed by the OPENSESAME player to be good only for this specific launch of the content. According to one embodiment of the invention, the system will not allow access if the user tries to use the same URL to later access the content.

At 3*e*, the learner's browser requests content from the CDN, and the content is loaded from the CDN into the user's browser.

FIG. 5 further depicts an alternative perspective on the LMS, the SESAMESEED proxy, the layering, and the content, as they relate to the learner's web browser and as is also described below.

Those with skill in the art will appreciate that, in accordance with one embodiment of the invention, the learner additionally or alternatively can participate in social features of a course (e.g. collaborating on-line with a fellow learner or tutor, 'attending' an online study group session, blogging about a course and its impact on the learning experience, etc.). Those with skill also will appreciate that such interactive learning tends to reinforce and thus to enrich the learning experience. It will also be understood that such interactions may be subject to restrictions from particular LMSs to prevent cheating, plagiarism, etc.

FIG. 3 illustrates the flow of content requests as they relate to the user only, and intentionally omits further communication between SESAMESEED proxy 22 and licensing/reporting server 14. FIG. 3 also intentionally omits depicting communication between the OPENSESAME player 18, content, and the licensing/reporting server (which enables tracking of a user's status in the course). Such omissions are made in the interest of drawing clarity alone, and no limitations should be inferred from the omissions.

FIG. 4 illustrates a learner's or training manager's use of invented system 10 to rate and review courses.

At 4*a*, the training manager provides a rating or review of a course through the interface of the catalog. In accordance with one embodiment of the invention, this is a direct contact between the training manager and the catalog.

At 4*b*, the learner provides a rating through their web browser to the OPENSESAME player.

At 4*c*, the OPENSESAME player stores the rating information in the OPEN SESAME catalog.

FIG. 5 is a block diagram depicting an information exchange model of the OPENSESAME system shown in FIGS. 1-4. Those with skill in the art will appreciate that FIG.

10

5 illustrates the invention as it is loaded into the user's web browser from the LMS and OPENSESAME system, and calls out specific communication protocols and methods. Identical elements in the embodiment of FIG. 5 are designated identically as in the embodiments of FIGS. 1-4, and like elements are designated identically except that they are represented as primed numbers, e.g. 18'. The learner's browser 38 is shown separately from the learner 32' in FIG. 5 for purposes of explanation only. An ordinarily skilled artisan will recognize that the learner's browser typically resides on the learner's computing device, as represented in one or more of the other figures as learner 32.

FIG. 5 may be seen further to include a content layer 34, an LMS course runtime 36, and a browser 38, all of which are believed to be largely self-explanatory. According to an embodiment, content layer 34 contains the e-learning content corresponding to the purchase; LMS course runtime 36 represents the LMS's built-in SCORM or AICC content player as resident in the user's browser; browser 38 is a standard browser (e.g., MICROSOFT INTERNET EXPLORER, MOZILLA FIREFOX, APPLE SAFARI, etc.) currently invoked on the user's device; and OPENSESAME course runtime 40 is the SCORM or AICC runtime resident in the user's browser. "In the browser" generally indicates that a set of instructions (e.g. a functional module) has been received from a remote or local data storage device, as in the conventional example of a web page retrieved from an internet source, and made available for user interaction via the browser.

Those with skill will appreciate that the communication steps indicated and explained below may in fact occur repeatedly, simultaneously, synchronously, or asynchronously depending upon the learner's input, how the courseware is authored, and which learning standard the courseware or SESAMESEED proxy implements.

In FIG. 5, the SESAMESEED resides in the user's browser but is delivered there by the customer LMS 26.

At 5*a*, a learner 32' instructs his or her web browser (by clicking or otherwise following an anchor tag as in the case of a screen-reader or mobile or other device) to request course pages from his or her customer LMS 26' via a hypertext transfer protocol (HTTP), and the browser conveys the request to the LMS. Course pages will typically include a launch URL that the LMS uses to look up and instruct the browser to request course content.

At 5*b*, as instructed in 5*a*, the learner's browser requests the LMS course runtime 36 from the customer LMS 26' and the LMS course runtime is loaded into the browser.

At 5*c*, the LMS course runtime 36 instructs the learner's browser 38 to requests a SESAMESEED proxy 24 from the customer LMS, via HTTP.

At 5*d*, the SESAMESEED proxy 24' instructs the learner's browser to request authorization from the OPENSESAME licensing/reporting server 14' for learner 32' to access the course specified in the proxy. If the request is successful, the response from the licensing/reporting server will include a location designator for a content player for the selected course/content.

At 5*e*, the SESAMESEED proxy 24' instructs the learner's browser 38 to load the OPENSESAME course runtime 40 from the OPENSESAME player 18', and the OPENSESAME course runtime 40 is loaded into the learner's browser 38. This request is in the form of an HTTP request parameterized with a query string.

At 5*f*, the OPENSESAME course runtime instructs the learner's browser to load content from the CDN, and the

US 8,784,113 B2

11

content is loaded into the learner's browser **38** from the CDN **16'** for viewing/learning/interacting by the learner.

At **5g**, the learner **32'** interacts with content **34** in their browser **38** via one or more output devices (e.g., a visual display device, a sound-generating device, a haptic-interface device, etc.) that are operably coupled with the learner's device **32'** and are configured to perceivably present the content to the learner. The interaction can include, but is not limited to, viewing, listening, or otherwise perceiving multimedia content, taking a training course and/or example, answering questions presented to the learner, etc.

At **5h**, the OPENSESAME course runtime **40** and content **34** communicate with each other via HTTP SCORM or AICC runtime requests, for example. This communication is bidirectional according to relevant standards, and accomplishes tasks necessary to present content to the user, resume where the user left off (bookmarking), and report a completion (full, partial, or failure) status to the player (refer to **5j** for completion status storage and aggregation).

At **5i**, the OPENSESAME course runtime **40** sends status updates to the OPENSESAME player **18'**.

At **5j**, the OPENSESAME player **18'** reports user completion status, scores, and/or ratings to the OPENSESAME licensing/reporting server **14'**, which may then report and/or aggregate the information provided by the OPENSESAME player **18'**. At **5k**, the SESAMESEED proxy **24'** sends status messages relating to course completion, progress, or score, for example, to the LMS course runtime **36**. At **5m**, the LMS course runtime **36** further conveys the status messages to the customer LMS **26'**.

FIGS. **6** and **7** are runtime block and flow diagrams of the SESAMESEED and other operative components of the invented system and method of FIGS. **1**-**5**. Those with skill will appreciate that identical elements in the embodiment of FIGS. **6** and **7** are designated identically as in FIGS. **1**-**4**. Although the SESAMESEED proxy **24** is typically loaded to and remains resident in the user's (e.g., a learner) browser during content viewing, the SESAMESEED proxy **24** in FIGS. **6** and **7** are shown separately solely for descriptive clarity and simplicity, and a functional or structural separation is not intended and not be inferred from FIGS. **6** and **7**.

FIG. **6** illustrates an embodiment of the SESAMESEED as a standards-based, e.g. SCORM package, and as such consists of a SCORM manifest (XML) file **41** a SCORM runtime implementation script (JAVASCRIPT files) **44**, and an HTML page (e.g., SESAMESEED HTML file) **42**. The manifest is a file or set of files which describe the contents or location of an e-learning course. In particular, the SCORM manifest file describes the contents of the SCORM package according to the SCORM standard. The implementation script generally comprises coded instructions that provide a common interface enabling standards-compliant content and players to communicate. In at least one embodiment, the implementation script is not contained in the proxy as originally delivered to the user's LMS, but is later downloaded from the licensing/reporting server to the learner's browser in response to a request from the HTML page.

The HTML page contains the minimal HTML and JAVASCRIPT tags and calls necessary to conform to the SCORM or other standard along with an authorization script.

FIG. **7** illustrates an embodiment of the SESAMESEED as a standards-based, e.g. AICC package, and as such consists of an AICC manifest consisting of four files (.au, .des, .cst, .crs) (e.g. AICC manifest) **45** and, in one embodiment, an HTML page (e.g. SESAMESEED HTML file) **42**. In another embodiment, the AICC manifest **45** is configured to instruct

12

the LMS to load the SESAMESEED HTML file **42** from a remote location rather than from the LMS. In this embodiment, SESAMESEED HTML file is not initially included in the SESAMESEED, but is instead loaded into the browser from any of the licensing/reporting server, the CDN, or the player.

These SESAMESEED files are all packaged, for example, into a zip archive or other compressed form, if compression is used in an embodiment. The HTML page is generally configured to receive the SCORM manifest and SCORM implementation script, for example, for operation within a learner's browser.

The SESAMESEED proxy **24** generally contains no training content as an intended security precaution against the pirating or unauthorized use, e.g. viewing, of content. An ordinarily skilled artisan will appreciate that the abstraction of the content ('content abstraction') from the LMS **26** also supports the ability to update content centrally.

At **6a**, when the SESAMESEED proxy is loaded into the customer LMS **26**, the LMS creates and stores a copy of the files contained therein, extracting or decompressing the SCORM package. The LMS then parses the manifest file **41** and stores metadata from the manifest, including the location where it stored the SESAMESEED proxy files and which page to send to the learner's web browser when the learner **32** requests the course. This information is typically presented to the user on an HTML page served by the customer LMS **26** in response to the user requesting the course. Note that the SESAMESEED files are loaded into the LMS system.

At **6b**, a user, via their browser, requests an OPENSESAME course from his or her LMS. In response, the LMS looks up the location of the SESAMESEED proxy **24**'s HTML launch page as previously specified in the manifest XML file and as stored in the LMS and returns the location to the learner's browser. The browser then requests the launch page, (e.g. SESAMESEED HTML) from the LMS, which then delivers the page in response.

At **6c**, in an embodiment of the invention, upon being loaded by the learner's browser, the SESAMESEED proxy's HTML page first instructs the learner's browser to instruct the SCORM runtime implementation script to initialize the LMS SCORM runtime, which creates an instance of the SCORM JAVASCRIPT runtime and discovers the LMS SCORM API according to the appropriate SCORM standard. In general, the SCORM runtime comprises a set of instructions loaded to the browser that enable a learner to load and interact with content, and enable content to interact with a player, including responding to commands from the content being played. As a SCORM package, the SESAMESEED proxy **24** uses this runtime software to communicate with the customer LMS **26** to report status updates, as at **6i** described below.

At **6d**, the SESAMESEED HTML page then instructs the browser to request an authorization script via a JAVASCRIPT script, which makes an HTTP request to the OPENSESAME licensing/reporting server **14**. This request provides as parameters the location of the requested script, its own license identifier, and the user identifier supplied to the SESAMESEED proxy SCORM package by the LMS.

The licensing server **14** returns a script to the browser containing code that the authorization script then executes. Execution of this script results in an access denied message being displayed to the user or, if access is granted, then the SCORM implementation script **44** instructs the browser to load the player **18** with the parameters and identifiers necessary to supply the content and to begin the user's interaction with the course. In an embodiment, this process is the same each time the user launches the course, and the licensing/

US 8,784,113 B2

13                                                14

reporting server logs all such requests for the purposes of reporting and limiting access to the number of users for whom the training manager has purchased access.

At **6***e*, if authorized, the SESAMESEED HTML instructs the browser to request the OPENSESAME course runtime corresponding to the course from the player. This request supplies the user information provided by the LMS as well as the license identification to the OPENSESAME player.

At **6***f*, the OPENSESAME player uses these parameters to record the learner's successful request (which has the effect of reserving one purchased license for that user) and to request an encoded URL to the actual content, which is then delivered to the player from the licensing/reporting server **14**. By this mechanism, the invention utilizes CDN security APIs to prevent unauthorized access to the content. The CDN security APIs differ by vendor, so the invented OPENSESAME system utilizes multiple CDNs for the sake of performance and fault-tolerance. As a result, implementation of a given instantiation of the invented system, and by extension the level of security provided, will vary by CDN vendor.

At **6***g*-**6***h*, the actual content files and the appropriate required runtime (SCORM or AICC) are delivered to the learner's browser via the OPENSESAME player. Those with skill in the art will appreciate that such content delivery may result from and/or be in response to many requests as the user progresses through a course.

At **6***i*, when the SESAMESEED proxy detects a status update from the player, the SESAMESEED proxy communicates the update to the LMS via the SCORM or AICC (for example) runtime provided by the LMS. In order to relay user progress and course results that are stored by the OPENSESAME player and the licensing/reporting server into the LMS via SCORM, the SESAMESEED proxy functions as a proxy for such status reporting. To accomplish this, the SESAMESEED proxy remains resident in the learner's web browser and monitors for status updates from the OPENSESAME player. When a status update is detected, the SESAMESEED proxy communicates with the LMS via the SCORM runtime provided by the LMS. It is by this mechanism that the LMS is notified when the user completes or fails a course and what their scores are (if such information is provided by the courseware).

At **7***a*, when the SESAMESEED proxy **25** is loaded into the customer LMS **26**, the LMS creates and stores a copy of the files contained therein, extracting or decompressing the AICC package. The LMS then parses the manifest file **45** and stores metadata from the manifest, including the location where it stored the SESAMESEED proxy files and which page to send to the learner's web browser when the learner **32** requests the course. This information is typically presented to the user on an HTML page **43** served by the customer LMS **26** in response to the user requesting the course. Note that the SESAMESEED files are loaded into the LMS system.

At **7***b*, a user, via their browser, requests an OPENSESAME course from his or her LMS. In response, the LMS looks up the location of the SESAMESEED proxy's HTML launch page **43** as previously specified in the manifest file **45** and as stored either in the LMS or on the OPENSESAME system (e.g. the licensing/reporting server, the CDN, or the player), and returns the location to the learner's browser. The browser then requests the launch page, (e.g. SESAMESEED HTML **43**) from the device/location indicated in the manifest **45**, and that device/location then delivers the page in response.

At **7***c*, in an embodiment of the invention, upon being loaded by the learner's browser, the SESAMESEED proxy's HTML page **43** instructs the browser to request an authoriza-

tion script via a JAVASCRIPT script, which makes an HTTP request to the OPENSESAME licensing/reporting server **14**. This request provides as parameters the location of the requested script, its own license identifier, and the user identifier supplied to the SESAMESEED proxy by the LMS.

The licensing server **14** returns a script to the browser containing code that the authorization script then executes. Execution of this script results in an access denied message being displayed to the user or, if access is granted, instructs the browser to load the player **18** with the parameters and identifiers necessary to supply the content and to begin the user's interaction with the course. In an embodiment, this process is the same each time the user launches the course, and the licensing/reporting server logs all such requests for the purposes of reporting and limiting access to the number of users for whom the training manager has purchased access.

At **7***e*, if authorized, the SESAMESEED HTML **43** instructs the browser to request from the player the OPENSESAME course runtime corresponding to the course. This request supplies the user information provided by the LMS as well as the license identification to the OPENSESAME player.

At **7***f*, the OPENSESAME player uses these parameters to record the learner's successful request (which has the effect of reserving one purchased license for that user), and to request an encoded URL to the actual content. The encoded URL is then delivered to the player from the licensing/reporting server **14**. By this mechanism, the invention utilizes CDN security APIs to prevent unauthorized access to the content. The CDN security APIs differ by vendor, so the invented OPENSESAME system utilizes multiple CDNs for the sake of performance and fault-tolerance. As a result, implementation of a given instantiation of the invented system, and by extension the level of security provided, will vary by CDN vendor.

At **7***g*-**7***h*, the actual content files and the appropriate required runtime (SCORM or AICC) are delivered to the learner's browser via the OPENSESAME player. Those with skill in the art will appreciate that such content delivery may result from and/or be in response to many requests as the user progresses through a course.

Those with skill in the art will appreciate that AICC embodiments generally differ from SCORM embodiments in the way that status messages are received by an LMS. In order to relay user progress and course results that are stored by the OPENSESAME player and the licensing/reporting server into the LMS via AICC, messages are sent to an AICC request processor resident on the LMS server, not a runtime that is loaded into the browser as in SCORM.

FIG. **7** illustrates at **7***i*, **7***j*, and **7***k* three different implementations according to alternative embodiments.

At **7***i*, when the SESAMESEED proxy detects a status update, the SESAMESEED proxy communicates the update to the LMS.

At **7***j*, when the OPENSESAME player detects a status update, the OPENSESAME Player communicates the update to the LMS.

At **7***k*, when the licensing/reporting server detects a status update, the licensing/reporting server communicates the update to the LMS.

FIG. **8** illustrates an embodiment of a monetization/business model enabled by the invented system and method. The illustrated model includes the OPENSESAME system **10** as described and illustrated herein. The model also includes authors **28** and learners **32**, as described above. Authors **28** may include professors, instructional designers, business leaders, business consultants, etc., any or all of whom may

US 8,784,113 B2

15

supply courses or other content to the OPENSESAME system 10 in exchange for money or other consideration. Authors can be individuals, teams, committees, etc. Learners 32 may include individuals, teams of individuals, traditionally enrolled students, employees, business consultants, etc. or others involved in continuing education, any or all of whom launch, 'attend' and complete courses.

An embodiment of the model further includes buyers 46 who might buy courses from the OPENSESAME system 10 for money or other consideration, and who act as intermediaries between the OPENSESAME system and the learners. Buyers 46 may include businesses, universities, individuals, etc. The model may further include sponsors 48 who supply courses and money or other consideration to the OPENSESAME system, so that the sponsors' courseware can be made available in an expanded e-learning marketplace to a broad number of learners via OPENSESAME system buyers, as shown. Sponsors 48 may include insurance companies, manufacturers, etc.

Those having skill in the art will appreciate that the monetization/business model may include pay-for-play, on-line PAYPAL-type authorizations or installment payment schema, that it may include individual learner or multiple learner site licenses representing per-learner discounts, that it may include courseware (multiple courses) discounts and/or bundling or even aggregation into diploma or degree curricula, and that it may include advertisements embedded in courseware to defray costs of development or marketing, although the embodiments are not so limited. (PAYPAL is a trademark owned by PayPal, Inc.). Those with skill will also appreciate that an embodiment may include survey/poll or webinar interactions, that it may include a problem/suggestion reporting mechanism, and/or that parts of it may be more closely coupled, e.g. integrated, with LMSs in order to better utilize new and improved LMS-specific capabilities. Any and all such suggested or equivalent modifications to and extensions of the invented OPENSESAME system and method and the above-described monetization/business model are contemplated as being within the spirit and scope of the invention.

Thus, a robust but open and interactive e-learning experience is unlocked by the use of the invented system and method. Authors are encouraged to submit content, training managers are encouraged to approve and recommend such content, and learners are encouraged to read and understand such content in a system of unparalleled utility and security. The user need not learn an arcane or different interface, since the content is made to play via visual and functional interfaces that are familiar to them. The difference is that more content is available because of monetary or other incentives given to authors to publish on-line courseware.

Those with skill in the art will appreciate that most of the machinery of the present invention (as depicted in the several drawing figures) can take the form of software or firmware stored in a memory for execution by a digital processor or other general-purpose computing element that is configured by specific instructions as a special-purpose computing machine. For example, the proprietary or third-party servers described herein all have such computerized machinery in them, as do user devices such as desktop or laptop computers, or hand-held digital devices such as personal digital assistants (PDAs), and mobile phones such as IPHONE® or DROID™ (IPHONE is a trademark owned by Apple Computer, Inc.; DROID is a trademark owned by Lucasfilm Ltd.). Such software and/or firmware can be programmed in any suitable

16

language and stored in object form in a memory device for execution by a suitable instruction processor thereby to realize the invention's utility.

In general, reference to a 'server' herein indicates a computing device configured as a server, including device executable instructions configured, when executed on a computing device, to enable the computing device to function as a server, as described herein. Such servers will, in most cases, also be operably coupled with, or configured to enable operable connection with, a data transfer network. Although several types of servers may be described with reference to a single embodiment of the invention, an ordinarily skilled artisan will recognize that a single computing device can be suitably configured with programming and/or circuitry to perform as two or more of the listed servers in at least one embodiment.

It will be understood that the present invention is not limited to the method or detail of construction, fabrication, material, application or use described and illustrated herein. Indeed, any suitable variation of fabrication, use, or application is contemplated as an alternative embodiment, and thus is within the spirit and scope, of the invention.

It is further intended that any other embodiments of the present invention that result from any changes in application or method of use or operation, configuration, method of manufacture, shape, size, or material, which are not specified within the detailed written description or illustrations contained herein yet would be understood by one skilled in the art, are within the scope of the present invention.

Finally, those with skill in the art will appreciate that the invented method, system and apparatus described and illustrated herein may be implemented in software, firmware or hardware, or any suitable combination thereof. Preferably, the method system and apparatus are implemented in a combination of the three, for purposes of low cost and flexibility. Thus, those with skill in the art will appreciate that embodiments of the methods and system of the invention may be implemented by a computer or microprocessor process in which instructions are executed, the instructions being stored for execution on a computer-readable medium and being executed by any suitable instruction processor.

Accordingly, while the present invention has been shown and described with reference to the foregoing embodiments of the invented apparatus, it will be apparent to those skilled in the art that other changes in form and detail may be made therein without departing from the spirit and scope of the invention as defined in the appended claims.

We claim:

1. An e-learning delivery system, comprising:

a licensing/reporting server;

a network-side content player operably coupled with each of the licensing/reporting server and a content delivery network comprising stored e-learning content; and

a proxy comprising coded instructions stored on a non-transitory computing device-readable medium at the network-side, wherein the proxy instructions identify a specific instance of licensed content, and wherein the proxy instructions are configured when executed on a client-side computing device to enable a user to access and interact with the licensed content via a browser of the computing device and are further configured to report a status of the user's interaction with the content to one or both of the licensing/reporting server and a learning management system (LMS);

wherein the licensing/reporting server includes coded instructions configured when executed to cause the licensing/reporting server to verify a validity status of the user license to the specific instance of content, and

US 8,784,113 B2

17 18

upon verifying the validity of the license, the instructions are further configured to cause the licensing/reporting server to provide to the proxy a location designator for accessing the content player;

wherein the proxy instructions are further configured, when executed on the client-side computing device in response to a request for access to the specific instance of content, to:

cause the client-side computing device to request verification by the licensing/reporting server of the validity status of a license to the specific instance of content; and

cause the client-side computing device to instruct a browser to access the content player via the location designator; and

wherein the proxy instructions are further configured to relay information to a client-side Learning Management System (LMS) including information indicating a status of content played by the content player.

**2.** The e-learning system of claim **1**, further comprising:

a network-side e-learning course catalog comprising coded instructions configured when executed on a computing device to request that the licensing/reporting server create a license to the specific instance of content in response to a user request.

**3.** The e-learning system of claim **1**, wherein the Licensing/reporting server is configured with instructions stored on a non-transitory computing-device-readable medium, and wherein the licensing/reporting server instructions are configured, when executed in response to a failed user license verification, to cause the licensing/reporting server to notify the proxy that the requested access is denied.

**4.** The e-learning system of claim **1**, wherein the proxy is operably compliant with either or both of the Shamble Content Object Reference Model (SCORM) and the Aviation industry Computer-Based Training Committee (MCC) e-learning standards.

**5.** A method for delivering e-learning standard-compliant content, comprising:

receiving a request from a learning management system of a user to access content residing on a content delivery network (CDN);

configuring a proxy with license information indicating a specific instance of licensed content, the configuring being performed by a network-side licensing/reporting server in response to the request;

providing the proxy to the user;

receiving, at the licensing/reporting server, a license verification request from the proxy;

providing, from the licensing/reporting server to the proxy in response to a successful license verification request received from the proxy, the content player location designator, wherein the proxy is further configured to instruct a learner's browser to load a content-specific course runtime from the content player;

loading the course runtime from the content player to the learner's browser;

instructing the learner's browser to request the licensed content from a content delivery network (CDN), the instructing being performed by the course runtime;

loading the licensed content from the CDN to the learner's browser;

reporting, from the content player to either or both of the licensing/reporting server and the proxy, the learner's status relative to the content; and

reporting from the proxy to the user's LMS the learner's status relative to the content.

**6.** The content delivery method of claim **5**, further comprising:

providing a network-linked content player, the content player being accessible to a learner's browser via a location designator.

**7.** The content delivery method of claim **5**, further comprising:

receiving at the licensing/reporting server a rating of e-learning content provided from a user.

**8.** The content delivery method of claim **7**, further comprising:

storing the rating information at a network-side catalog operably coupled with the licensing/reporting server.

**9.** The content delivery method of claim **5**, wherein the license information of the proxy is configured, when received by either or both of the license/reporting server and the CDN as part of a request to access licensed content, to be used by the licensing/reporting server and/or the CDN respectively to limit a number of instances that the content can be accessed via the location designator.

**10.** The content delivery method of claim **5**, wherein the proxy is operably compliant with one or both of Sharable Content Object Reference Model (SCORM) and Aviation industry Computer-Based Training Committee (AICC) e-learning standards.

**11.** An e-learning proxy comprising:

instructions stored on a non-transitory computing-device-readable medium, wherein the instructions are configured when executed on a computing device to cause the computing device to:

send a request to a network-side licensing/reporting server to verify a license to a specific instance of content in response to a learner's request for access to the content;

receive from the licensing/reporting server, in response to a successful verification of the license, a location designator for a content player; and

instruct a learner's browser to access and load the content player via the location designator;

wherein:

the proxy instructions include license information rendering the proxy specific to the specific instance of licensed content;

the proxy itself does not contain any e-learning course content;

the proxy is configured to be loaded from the user's LMS to the learner's browser in response to a request from the learner for access to the licensed content;

the proxy instructions are configured, when the proxy is loaded to the learner's browser, to instruct the implementation script to initialize a runtime compliant with the e-learning standard; and

the proxy instructions are further configured to use the runtime to communicate with the LMS and to report status updates of the learner's interaction with the content.

**12.** The e-learning proxy of claim **11**, wherein the proxy further comprises:

an e-learning standard-based manifest.

**13.** The e-learning proxy of claim **11**, wherein the proxy further comprises:

an e-learning standard-based implementation script.

**14.** The e-learning proxy of claim **11**, wherein the proxy further comprises:

a hypertext markup language (HTML) page configured to receive, for operation within a learner's browser, either

US 8,784,113 B2

19

20

or both of an e-learning standard-based manifest and an e-learning standard-based implementation script.

15. The e-learning proxy of claim **11**, wherein the proxy is operably compliant with one or both of Shamble Content Object Reference Model (SCORM) and Aviation Industry Computer-Based. Training Committee (AICC) e-learning standards.

16. The e-leaning proxy of claim **11**, wherein the request to the network-side licensing/reporting server includes a license identifier and a user identifier.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 8,784,113 B2                                Page 1 of 1
APPLICATION NO.  : 13/156607
DATED             : July 22, 2014
INVENTOR(S)      : Bridges et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Claims

Column 17:
  Claim 3 at line 26, delete "wherein the Licensing/reporting server is" and insert --wherein the licensing/reporting server is--

Column 17:
  Claim 4 at line 34, delete "with either or both of the Shamble Content" and insert --with either or both of the Sharable Content--

Column 17:
  Claim 4 at line 35, delete "Aviation industry Computer-Based Training Committee (MCC)" and insert --Aviation Industry Computer-Based Training Committee (AICC)--

Column 19:
  Claim 15 at line 4, delete "compliant with one or both of Shamble Content" and insert --compliant with one or both of Sharable Content--

Column 19:
  Claim 16 at line 8, delete "The e-leaning proxy of" and insert --The e-learning proxy of--

Signed and Sealed this
Twenty-first Day of October, 2014

Michelle K. Lee

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.        : 8,784,113 B2                                    Page 1 of 1
APPLICATION NO.   : 13/156607
DATED             : July 22, 2014
INVENTOR(S)       : Aaron H. Bridges et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On the title page item "(76)" should read --(75)--

On the title page insert item (73),

-- OpenSesame Inc., Portland, OR (US) --

Signed and Sealed this
Third Day of November, 2015

Michelle K. Lee
*Director of the United States Patent and Trademark Office*

# CERTIFICATE OF COMPLIANCE

The brief complies with the type-volume limitation of Fed. Cir. R. 32(b)(1) because this brief contains 7016 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Century Schoolbook 14-point font.

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Robbie Manhas*
Robbie Manhas
*Counsel for Appellant*